# ASHWANDER ET AL. *v.* TENNESSEE VALLEY AUTHORITY ET AL.

Nos. 403 and 404.  Argued December 19, 20, 1935.—Decided February 17, 1936.

*Messrs. Forney Johnston* and *James M. Beck,* with whom *Mr. Joseph F. Johnston* was on the brief, for petitioners.

298

302

306

*Mr. John Lord O'Brian* and *Solicitor General Reed,* with whom *Attorney General Cummings, Mr. James Lawrence Fly,* General Solicitor, Tennessee Valley Authority, and *Messrs. Paul A. Freund* and *Allan D. Jones,* and *Miss Bessie Margolin* were on the brief, for the Tennessee Valley Authority, respondent.

312

*Mr. W. H. Mitchell* submitted for the City of Florence, respondent.

*Messrs. Thomas W. Martin, Perry W. Turner,* and *Wm. Logan Martin* submitted for the Alabama Power Co., respondent.

*Messrs. Courtland Palmer* and *Jehu T. Stokely* submitted for The Chemical Bank & Trust Co., respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

On January 4, 1934, the Tennessee Valley Authority, an agency of the Federal Government,[1] entered into a contract with the Alabama Power Company, providing (1) for the purchase by the Authority from the Power Company of certain transmission lines, sub-stations, and auxiliary properties for $1,000,000, (2) for the purchase by the Authority from the Power Company of certain real property for $150,000, (3) for an interchange of hydro-electric energy, and in addition for the sale by the Authority to the Power Company of its "surplus power," on stated terms, and (4) for mutual restrictions as to the areas to be served in the sale of power. The contract was amended and supplemented in minor particulars on February 13 and May 24, 1934.[2]

The Alabama Power Company is a corporation organized under the laws of Alabama and is engaged in the generation of electric energy and its distribution generally throughout that State, its lines reaching 66 counties. The transmission lines to be purchased by the Authority extend from Wilson Dam, at the Muscle Shoals plant owned by the United States on the Tennessee River in

[1] The Tennessee Valley Authority is a body corporate created by the Act of Congress of May 18, 1933, amended by the Act of Congress of August 31, 1935. 48 Stat. 58; 49 Stat. 1075.

[2] The Commonwealth & Southern Corporation, organized under the laws of Delaware, and the owner of the common stock of the Alabama Power Company, was a party to the contract, which also contained agreements with other subsidiaries of the Commonwealth & Southern Corporation, viz: Tennessee Electric Power Company, Georgia Power Company, and Mississippi Power Company. The agreements with these companies are not involved in this suit.

northern Alabama, into seven counties in that State, within a radius of about 50 miles. These lines serve a population of approximately 190,000, including about 10,000 individual customers, or about one-tenth of the total number served directly by the Power Company. The real property to be acquired by the Authority (apart from the transmission lines above mentioned and related properties) is adjacent to the area known as the "Joe Wheeler dam site," upon which the Authority is constructing the Wheeler Dam.

The contract of January 4, 1934, also provided for cooperation between the Alabama Power Company and the Electric Home and Farm Authority, Inc., a subsidiary of the Tennessee Valley Authority, to promote the sale of electrical appliances, and to that end the Power Company, on May 21, 1934, entered into an agency contract with the Electric Home and Farm Authority, Inc. It is not necessary to detail or discuss the proceedings in relation to that transaction, as it is understood that the latter corporation has been dissolved.

There was a further agreement on August 9, 1934, by which the Alabama Power Company gave an option to the Tennessee Valley Authority to acquire urban distribution systems which had been retained by the Power Company in municipalities within the area served by the transmission lines above mentioned. It appears that this option has not been exercised and that the agreement has been terminated.

Plaintiffs are holders of preferred stock of the Alabama Power Company. Conceiving the contract with the Tennessee Valley Authority to be injurious to the corporate interests and also invalid, because beyond the constitutional power of the Federal Government, they submitted their protest to the board of directors of the Power Company and demanded that steps should be taken to have the contract annulled. The board refused, and the

Commonwealth & Southern Corporation, the holder of all the common stock of the Power Company, declined to call a meeting of the stockholders to take action. As the protest was unavailing, plaintiffs brought this suit to have the invalidity of the contract determined and its performance enjoined. Going beyond that particular challenge, and setting forth the pronouncements, policies and programs of the Authority, plaintiffs sought a decree restraining these activities as repugnant to the Constitution, and also asked a general declaratory decree with respect to the rights of the Authority in various relations.

The defendants, including the Authority and its directors, the Power Company and its mortgage trustee, and the municipalities within the described area, filed answers and the case was heard upon evidence. The District Court made elaborate findings and entered a final decree annulling the contract of January 4, 1934, and enjoining the transfer of the transmission lines and auxiliary properties. The court also enjoined the defendant municipalities from making or performing any contracts with the Authority for the purchase of power, and from accepting or expending any funds received from the Authority or the Public Works Administration for the purpose of constructing a public distribution system to distribute power which the Authority supplied. The court gave no consideration to plaintiffs' request for a general declaratory decree.

The Authority, its directors, and the city of Florence appealed from the decree and the case was severed as to the other defendants. Plaintiffs took a cross appeal.

The Circuit Court of Appeals limited its discussion to the precise issue with respect to the effect and validity of the contract of January 4, 1934. The District Court had found that the electric energy required for the territory served by the transmission lines to be purchased

under that contract is available at Wilson Dam without the necessity for any interconnection with any other dam or power plant. The Circuit Court of Appeals accordingly considered the constitutional authority for the construction of Wilson Dam and for the disposition of the electric energy there created. In the view that the Wilson Dam had been constructed in the exercise of the war and commerce powers of the Congress and that the electric energy there available was the property of the United States and subject to its disposition, the Circuit Court of Appeals decided that the decree of the District Court was erroneous and should be reversed. The court also held that plaintiffs should take nothing by their cross appeal. 78 F. (2d) .578. On plaintiffs' application we granted writs of certiorari.

*First. The right of plaintiffs to bring this suit.* Plaintiffs sue in the right of the Alabama Power Company. They sought unsuccessfully to have that right asserted by the Power Company itself, and upon showing their demand and its refusal they complied with the applicable rule.[3] While their stock holdings are small, they have a real interest and there is no question that the suit was brought in good faith.[4] If otherwise entitled, they should not be denied the relief which would be accorded to one who owned more shares.

Plaintiffs did not simply challenge the contract of January 4, 1934, as improvidently made,—as an unwise exercise of the discretion vested in the board of directors. They challenged the contract both as injurious to the

---

[3] Equity Rule 27.

[4] The District Court found that "Approximately 1900 preferred stockholders of the Alabama Company, holding over 40,000 shares of the preferred stock thereof, have associated themselves with a preferred stockholders' protective committee and authorized their names to be joined with the plaintiffs of record in this case as parties plaintiff."

interests of the corporation and as an illegal transaction,—violating the fundamental law. In seeking to prevent the carrying out of the contract, the suit was directed not only against the Power Company but against the Authority and its directors upon the ground that the latter, under color of the statute, were acting beyond the powers which the Congress could validly confer. In such a case it is not necessary for stockholders—when their corporation refuses to take suitable measures for its protection—to show that the managing board or trustees have acted with fraudulent intent or under legal duress. To entitle the complainants to equitable relief, in the absence of an adequate legal remedy, it is enough for them to show the breach of trust or duty involved in the injurious and illegal action. Nor is it necessary to show that the transaction was *ultra vires* of the corporation. The illegality may be found in the lack of lawful authority on the part of those with whom the corporation is attempting to deal. Thus, the breach of duty may consist in yielding, without appropriate resistance, to governmental demands which are without warrant of law or are in violation of constitutional restrictions. The right of stockholders to seek equitable relief has been recognized when the managing board or trustees of the corporation have refused to take legal measures to resist the collection of taxes or other exactions alleged to be unconstitutional (*Dodge* v. *Woolsey,* 18 How. 331, 339, 340, 345; *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 433, 553, 554; *Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 10); or because of the failure to assert the rights and franchises of the corporation against an unwarranted interference through legislative or administrative action (*Greenwood* v. *Freight Co.,* 105 U. S. 13, 15, 16; *Cotting* v. *Kansas City Stockyards Co.,* 183 U. S. 79, 114). The remedy has been accorded to stockholders of public service corporations with respect to rates alleged to be con-

fiscatory (*Smyth* v. *Ames,* 169 U. S. 466, 469, 517; *Ex parte Young,* 209 U. S. 123, 129, 130, 143). The fact that the directors in the exercise of their judgment, either because they were disinclined to undertake a burdensome litigation or for other reasons which they regarded as substantial, resolved to comply with the legislative or administrative demands, has not been deemed an adequate ground for denying to the stockholders an opportunity to contest the validity of the governmental requirements to which the directors were submitting. See *Dodge* v. *Woolsey, supra,* at pp. 340, 345; *Greenwood* v. *Freight Co., supra,* at p. 15; *Pollock* v. *Farmers' Loan & Trust Co,, supra,* at pp. 433, 553, 554; *Brushaber* v. *Union Pacific R. Co., supra,* at p. 10.

In *Smith* v. *Kansas City Title Co.,* 255 U. S. 180, a shareholder of the Title Company sought to enjoin the directors from investing its funds in the bonds of Federal Land Banks and Joint Stock Land Banks upon the ground that the Act of Congress authorizing the creation of these banks and the issue of bonds was unconstitutional, and hence that the bonds were not legal securities in which the corporate funds could lawfully be invested. The proposed investment was not large,—only $10,000 in each of the classes of bonds described. *Id.,* pp. 195, 196. And it appeared that the directors of the Title Company maintained that the Federal Farm Loan Act was constitutional and that the bonds were "valid and desirable investments." *Id.,* p. 201. But neither the conceded fact as to the judgment of the directors nor the small amount to be invested,—shown by the averments of the complaint— availed to defeat the jurisdiction of the court to decide the question as to the validity of the Act and of the bonds which it authorized. The Court held that the validity of the Act was directly drawn in question and that the shareholder was entitled to maintain the suit. The Court said: "The general allegations as to the interest of the

shareholder, and his right to have an injunction to prevent the purchase of the alleged unconstitutional securities by misapplication of the funds of the corporation, give jurisdiction under the principles settled in *Pollock* v. *Farmers' Loan & Trust Co.* and *Brushaber* v. *Union Pacific R. Co., supra.*" *Id.*, pp. 201, 202. The Court then proceeded to examine the constitutional question and sustained the legislation under attack. A similar result was reached in *Brushaber* v. *Union Pacific R. Co., supra.* A close examination of these decisions leads inevitably to the conclusion that they should either be followed or be frankly overruled. We think that they should be followed, and that the opportunity to resort to equity, in the absence of an adequate legal remedy, in order to prevent illegal transactions by those in control of corporate properties, should not be curtailed because of reluctance to decide constitutional questions.

We find no distinctions which would justify us in refusing to entertain the present controversy. It is urged that plaintiffs hold preferred shares and that, for the present purpose, they are virtually in the position of bondholders. The rights of bondholders, in case of injury to their interests through unconstitutional demands upon, or transactions with, their corporate debtor, are not before us. Compare *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 367, 368. Plaintiffs are not creditors but shareholders (with equal voting power share for share with the common stockholders, according to the findings) and thus they have a proprietary interest in the corporate enterprise which is subject to injury through breaches of trust or duty on the part of the directors who are not less the representatives of the plaintiffs because their shares have certain preferences. See *Ball* v. *Rutland R. Co.*, 93 Fed. 513, 514, 515. It may be, as in this case, that the owner of all the common stock has participated in the transaction in question, and the owners of preferred

stock may be the only persons having a proprietary interest in the corporation who are in a position to protect its interests against what is asserted to be an illegal disposition of its property.[5] A court of equity should not shut its door against them.

It is said that here, instead of parting with money, as in the case of illegal or unconstitutional taxes or exactions, the Power Company is to receive a substantial consideration under the contract in suit. But the Power Company is to part with transmission lines which supply a large area, and plaintiffs allege that the consideration is inadequate and that the transaction entails a disruption of services and a loss of business and franchises. If, as plaintiffs contend, those purporting to act as a governmental agency had no constitutional authority to make the agreement, its execution would leave the Power Company with doubtful remedy, either against the governmental agency which might not be able, or against the Government which might not be willing, to respond to a demand for the restoration of conditions as they now exist. In what circumstances and with what result such an effort at restoration might be made is unpredictable. If, as was decided in *Smith* v. *Kansas City Title Co.,* *supra,* stockholders had the right to sue to test the validity of a proposed investment in the bonds of land banks, we can see no reason for denying to these plaintiffs a similar resort to equity in order to challenge, on the ground of unconstitutionality, a contract involving such a dislocation and misapplication of corporate property as are charged in the instant case.

The Government urges that the Power Company is estopped to question the validity of the Act creating the Tennessee Valley Authority and hence that the stockholders, suing in the right of the corporation, cannot

---

[5] See note 2.

maintain this suit. It is said that the Power Company, in 1925, installed its own transformers and connections at Wilson Dam and has ever since purchased large quantities of electric energy there generated, and that the Power Company continued its purchases after the passage of the Act of 1933 constituting the Authority. The principle is invoked that one who accepts the benefit of a statute cannot be heard to question its constitutionality. *Great Falls Manufacturing Co.* v. *Attorney General,* 124 U. S. 581; *Wall* v. *Parrot Silver & Copper Co.,* 244 U. S. 407; *St. Louis Casting Co.* v. *Prendergast Construction Co.,* 260 U. S. 469. We think that the principle is not applicable here. The prior purchase of power in the circumstances disclosed may have a bearing upon the question before us, but it is by no means controlling. The contract in suit manifestly has a broader range and we find nothing in the earlier transactions which preclude the contention that this contract goes beyond the constitutional power of the Authority. Reference is also made to a proceeding instituted by the Power Company to obtain the approval of the contract by the Alabama Public Service Commission and to the delay in the bringing of this suit. It was brought on October 8, 1934, following plaintiffs' demand upon the board of directors in the preceding August. Estoppel in equity must rest on substantial grounds of prejudice or change of position, not on technicalities. We see no reason for concluding that the delay or the proceeding before the Commission caused any prejudice to either the Power Company or the Authority, so far as the subject matter of the contract between them is concerned, or that there is any basis for the claim of estoppel.

We think that plaintiffs have made a sufficient showing to entitle them to bring suit and that a constitutional question is properly presented and should be decided.

*Second. The scope of the issue.* We agree with the Circuit Court of Appeals that the question to be determined is limited to the validity of the contract of January 4, 1934. The pronouncements, policies and program of the Tennessee Valley Authority and its directors, their motives and desires, did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of the persons complaining. The judicial power does not extend to the determination of abstract questions. *Muskrat* v. *United States,* 219 U. S. 346, 361; *Liberty Warehouse Co.* v. *Grannis,* 273 U. S. 70, 74; *Willing* v. *Chicago Auditorium Assn.,* 277 U. S. 274, 289; *Nashville, C. & St. L. Ry. Co.* v. *Wallace,* 288 U. S. 249, 262, 264. It was for this reason that the Court dismissed the bill of the State of New Jersey which sought to obtain a judicial declaration that in certain features the Federal Water Power Act [6] exceeded the authority of the Congress and encroached upon that of the State. *New Jersey* v. *Sargent,* 269 U. S. 328. For the same reason, the State of New York, in her suit against the State of Illinois, failed in her effort to obtain a decision of abstract questions as to the possible effect of the diversion of water from Lake Michigan upon hypothetical water power developments in the indefinite future. *New York* v. *Illinois,* 274 U. S. 488. At the last term the Court held, in dismissing the bill of the United States against the State of West Virginia, that general allegations that the State challenged the claim of the United States that the rivers in question were navigable, and asserted a right superior to that of the United States to license their use for power production, raised an issue "too vague and ill-defined to admit of judicial determination." *United States* v. *West Virginia,* 295 U. S. 463, 474. Claims based merely upon "assumed potential invasions"

---

[6] 41 Stat. 1063.

of rights are not enough to warrant judicial intervention. *Arizona* v. *California,* 283 U. S. 423, 462.

The Act of June 14, 1934,[7] providing for declaratory judgments, does not attempt to change the essential requisites for the exercise of judicial power. By its terms, it applies to "cases of actual controversy," a phrase which must be taken to connote a controvery of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts. See *Nashville, C. & St. L. Ry. Co.* v. *Wallace, supra.* While plaintiffs, as stockholders, might insist that the board of directors should take appropriate legal measures to extricate the corporation from particular transactions and agreements alleged to be invalid, plaintiffs had no right to demand that the directors should start a litigation to obtain a general declaration of the unconstitutionality of the Tennessee Valley Authority Act in all its bearings or a decision of abstract questions as to the right of the Authority and of the Alabama Power Company in possible contingencies.

Examining the present record, we find no ground for a demand by plaintiffs except as it related to the contracts between the Authority and the Alabama Power Company. And as the contract of May 21, 1934, with the Electric Home and Farm Authority, Inc., and that of August 9, 1934, for an option to the Authority to acquire urban distribution systems, are understood to be inoperative (*ante,* p. 316), the only remaining questions that plaintiffs are entitled to raise concern the contract of January 4, 1934, providing for the purchase' of transmission lines and the disposition of power.

There is a further limitation upon our inquiry. As it appears that the transmission lines in question run from the Wilson Dam and that the electric energy generated at that dam is more than sufficient to supply all the re-

[7] 48 Stat. 955.

quirements of the contract, the questions that are properly before us relate to the constitutional authority for the construction of the Wilson Dam and for the disposition, as provided in the contract, of the electric energy there generated.

*Third. The constitutional authority for the construction of the Wilson Dam.* The Congress may not, "under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government." Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316, 423; *Linder* v. *United States,* 268 U. S. 5, 17. The Government's argument recognizes this essential limitation. The Government's contention is that the Wilson Dam was constructed, and the power plant connected with it was installed, in the exercise by the Congress of its war and commerce powers, that is, for the purposes of national defense and the improvement of navigation.

Wilson Dam is described as a concrete monolith one hundred feet high and almost a mile long, containing two locks for navigation and eight installed generators. Construction was begun in 1917 and completed in 1926. Authority for its construction is found in § 124 of the National Defense Act of June 3, 1916.[8] It authorized the President to cause an investigation to be made in order to determine "the best, cheapest, and most available means for the production of nitrates and other products for munitions of war"; to designate for the exclusive use of the United States "such site or sites upon any navigable or nonnavigable river or rivers or upon the public lands, as in his opinion will be necessary for carrying out the purposes of this Act"; and "to construct, maintain and operate" on any such site "dams, locks, improvements to navigation, power houses, and other plants and equipment or other

---

[8] 39 Stat. 166, 215.

means than water power as in his judgment is the best and cheapest, necessary or convenient for the generation of electrical or other power and for the production of nitrates or other products needed for munitions of war and useful in the manufacture of fertilizers and other useful products." The President was authorized to lease, or acquire by condemnation or otherwise such lands as might be necessary and there was further provision that "The products of such plants shall be used by the President for military and naval purposes to the extent that he may deem necessary, and any surplus which he shall determine is not required shall be sold and disposed of by him under such regulations as he may prescribe." *Id.*

We may take judicial notice of the international situation at the time the Act of 1916 was passed, and it cannot be successfully disputed that the Wilson Dam and its auxiliary plants, including the hydro-electric power plant, are, and were intended to be, adapted to the purposes of national defense.[9] While the District Court found that there is no intention to use the nitrate plants or the hydro-electric units installed at Wilson Dam for the production

---

[9]Among the findings of the District Court on this point are the following:

"38. The Muscle Shoals plants, including the Sheffield steam plant and the 8 hydro-electric units installed at Wilson Dam, were authorized for war purposes by Section 124 of the National Defense Act of 1916 in anticipation of participation in the great war. The original conception was for the use of Nitrate Plant No. 1 employing the Haber process and Plant No. 2 employing the cyanamide process for the fixation or manufacture of nitrogen and its subsequent conversion into ammonium nitrate for explosives. Plant No. 1 was completed but was never practicable, due to the lack of knowledge of the Haber process. Plant No. 2 successfully developed calcium cyanamide from a manufacturing standpoint but due to the availability of ammonium nitrate as a result of commercial development of by-product or synthetic processes, the commercial or peacetime manufacture of calcium cyanamide at Nitrate Plant No. 2 is

of war materials in time of peace, "the maintenance of said properties in operating condition and the assurance of an abundant supply of electric energy in the event of war, constitute national defense assets." This finding has ample support.

The Act of 1916 also had in view "improvements to navigation." Commerce includes navigation. "All America understands, and has uniformly understood," said Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1, 190, "the word 'commerce,' to comprehend navigation." The power to regulate interstate commerce embraces the power to keep the navigable rivers of the United States free from obstructions to navigation and to remove such obstructions when they exist. "For these purposes," said the Court in *Gilman* v. *Philadelphia,* 3 Wall. 713, 725, "Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England." See, also, *Philadelphia Company* v. *Stimson,* 223 U. S. 605, 634.

The Tennessee River is a navigable stream, although there are obstructions at various points because of shoals, reefs and rapids. The improvement of navigation on this river has been a matter of national concern for over a century. Recommendation that provision be made for

---

considered uneconomical and undesirable and is not proposed or suggested by either the War Department or the TVA. The Court further finds, however, that the plant with the aid of electric power furnished by Wilson Dam and the Sheffield steam plant can be operated to produce annually 110,000 tons of ammonium nitrate by the cyanamide process and that the present plans of the War Department count upon that plant to supply that amount annually in the event of a major war. . . .

"40. The existence of these facilities which make available large quantities of nitrogenous war materials by use of either the nitrogen fixing process or the oxidation of synthetic ammonia is a valuable national defense asset."

navigation around Muscle Shoals was made by the Secretary of War, John C. Calhoun, in his report transmitted to the Congress by President Monroe in 1824,[10] and, from 1852, the Congress has repeatedly authorized projects to develop navigation on that and other portions of the river, both by open channel improvements and by canalization.[11] The Wilson Dam project, adopted in 1918, gave a nine foot slack water development, for fifteen miles above Florence, over the Muscle Shoals rapids and, as the District Court found, "flooded out the then existing canal and locks which were inadequate." The District Court also found that a "high dam of this type was the only feasible means of eliminating this most serious obstruction to navigation." By the Act of 1930, after a protracted study by the Corps of Engineers of the United States Army, the Congress adopted a project for a permanent improvement of the main stream "for a navigable depth of nine feet." [12]

While, in its present condition, the Tennessee River is not adequately improved for commercial navigation, and traffic is small, we are not at liberty to conclude either that the river is not susceptible of development as an important waterway, or that Congress has not undertaken

---

[10] Sen. Doc. No. 1, 18th Cong., 2d sess.; H. R. Doc. No. 119, 69th Cong., 1st sess., 11, 12.

[11] See Rivers and Harbors Acts of August 30, 1852, c. 104, 10 Stat. 56, 60; July 25, 1868, c. 233, 15 Stat. 171, 174; March 3, 1871, c. 118, 16 Stat. 538, 542; June 10, 1872, c. 416, 17 Stat. 370, 372; September 19, 1890, c. 907, 26 Stat. 426, 445, 446; August 18, 1894, c. 299, 28 Stat. 338, 354; April 26, 1904, c. 1605, 33 Stat. 309; March 2, 1907, c. 2509, 34 Stat. 1073, 1093; June 25, 1910, c. 382, 36 Stat. 630, 652; July 25, 1912, c. 253, 37 Stat. 201, 215; July 27, 1916, c. 260, 39 Stat. 391, 399; March 3, 1925, c. 467, 43 Stat. 1186, 1188; July 3, 1930, c. 847, 46 Stat. 918, 927, 928. See, also, H. R. Docs. No. 319, 67th Cong., 2d sess.; No. 463, 69th Cong., 1st sess.; No. 185, 70th Cong., 1st sess.; No. 328, 71st Cong., 2d sess.

[12] Act of July 3, 1930, c. 847, 46 Stat. 918, 927, 928.

that development, or that the construction of the Wilson Dam was not an appropriate means to accomplish a legitimate end.

The Wilson Dam and its power plant must be taken to have been constructed in the exercise of the constitutional functions of the Federal Government.

*Fourth. The constitutional authority to dispose of electric energy generated at the Wilson Dam.* The Government acquired full title to the dam site, with all riparian rights. The power of falling water was an inevitable incident of the construction of the dam. That water power came into the exclusive control of the Federal Government. The mechanical energy was convertible into electric energy, and the water power, the right to convert it into electric energy, and the electric energy thus produced, constitute property belonging to the United States. See *Green Bay Canal Co.* v. *Patten Paper Co.,* 172 U. S. 58, 80; *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, 72, 73; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165, 170.

Authority to dispose of property constitutionally acquired by the United States is expressly granted to the Congress by § 3 of Article IV of the Constitution. This section provides:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."

To the extent that the power of disposition is thus expressly conferred, it is manifest that the Tenth Amendment is not applicable. And the Ninth Amendment (which petitioners also invoke) in insuring the maintenance of the rights retained by the people does not withdraw the rights which are expressly granted to the

Federal Government. The question is as to the scope of the grant and whether there are inherent limitations which render invalid the disposition of property with which we are now concerned.

The occasion for the grant was the obvious necessity of making provision for the government of the vast territory acquired by the United States. The power to govern and to dispose of that territory was deemed to be indispensable to the purposes of the cessions made by the States. And yet it was a matter of grave concern because of the fear that "the sale and disposal" might become "a source of such immense revenue to the national government, as to make it independent of and formidable to the people." Story on the Constitution, §§ 1325, 1326. The grant was made in broad terms, and the power of regulation and disposition was not confined to territory, but extended to "other property belonging to the United States," so that the power may be applied, as Story says, "to the due regulation of all other personal and real property rightfully belonging to the United States." And so, he adds, "it has been constantly understood and acted upon." *Id*.

This power of disposal was early construed to embrace leases, thus enabling the Government to derive profit through royalties. The question arose with respect to a government lease of lead mines on public lands, under the Act of March 3, 1807. The contention was advanced that "disposal is not letting or leasing"; that Congress had no power "to give or authorize leases" and "to obtain profits from the working of the mines." The Court overruled the contention, saying: "The disposal must be left to the discretion of Congress. And there can be no apprehensions of any encroachments upon state rights, by the creation of a numerous tenantry within their borders, as has been so strenuously urged in the argument." *United States* v. *Gratiot*, 14 Pet. 526, 533, 538. The policy, early

adopted and steadily pursued, of segregating mineral lands from other public lands and providing for leases, pointed to the recognition both of the full power of disposal and of the necessity of suitably adapting the methods of disposal to different sorts of property. The policy received particular emphasis following the discovery of gold in California in 1848.[13] For example, an Act of 1866, dealing with grants to Nevada, declared that "in all cases lands valuable for mines of gold, silver, quicksilver, or copper shall be reserved from sale." [14] And Congress from the outset adopted a similar practice in reserving salt springs. *Morton* v. *Nebraska,* 21 Wall. 660, 667; *Montello Salt Co.* v. *Utah,* 221 U. S. 452. It was in the light of this historic policy that the Court held that the school grant to Utah by the Enabling Act of 1894 [15] was not intended to embrace land known to be valuable for coal. *United States* v. *Sweet,* 245 U. S. 563, 572. See, also, as to the reservation and leases of oil lands, *Pan American Petroleum Co.* v. *United States,* 273 U. S. 456, 487.

But when Congress thus reserved mineral lands for special disposal, can it be doubted that Congress could have provided for mining directly by its own agents, instead of giving that right to lessees on the payment of royalties? [16] Upon what ground could it be said that the Government could not mine its own gold, silver, coal, lead, or phosphates in the public domain, and dispose of them as property belonging to the United States? That it could dis-

---

[13] See citations of numerous statutes in *United States* v. *Sweet,* 245 U. S. 563, 568, 569.

[14] Act of July 4, 1866, c. 166, § 5, 14 Stat. 85, 86.

[15] Act of July 16, 1894, c. 138, 28 Stat. 107.

[16] See, as to royalties under leases "to promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain," the Act of February 25, 1920, c. 85, 41 Stat. 437. Also, as to leases of public lands containing potassium deposits, the Act of October 2, 1917, c. 62, 40 Stat. 297.

pose of its land but not of what the land contained? It would seem to be clear that under the same power of disposition which enabled the Government to lease and obtain profit from sales by its lessees, it could mine and obtain profit from its own sales.

The question is whether a more limited power of disposal should be applied to the water power, convertible into electric energy, and to the electric energy thus produced at the Wilson Dam constructed by the Government in the exercise of its constitutional functions. If so, it must be by reason either of (1) the nature of the particular property, or (2) the character of the "surplus" disposed of, or (3) the manner of disposition.

(1) That the water power and the electric energy generated at the dam are susceptible of disposition as property belonging to the United States is well established. In the case of *Green Bay Canal Co.* v. *Patten Paper Co.*, *supra*, the question was "whether the water power, incidentally created by the erection and maintenance of the dam and canal for the purpose of navigation in Fox River" was "subject to control and appropriation by the United States, owning and operating those public works, or by the State of Wisconsin, within whose limits Fox River lies." *Id.*, pp. 68, 69. It appeared that, under the authority of the Congress, the United States had acquired, by purchase from a Canal Company, title to its improvement works, lands and water powers, on the Fox River, and that the United States had consented to the retention by the Canal Company of the water powers with appurtenances. We held that the "substantial meaning of the transaction was, that the United States granted to the Canal Company the right to continue in the possession and enjoyment of the water powers and the lots appurtenant thereto, subject to the rights and control of the United States as owning and operating the public works"; and that the method by which the arrangement was

effected was "as efficacious as if the entire property had been conveyed to the United States by one deed, and the reserved properties had been reconveyed to the Canal Company by another." *Id.*, p. 80. We thought it clear that the Canal Company was "possessed of whatever rights to the use of this incidental water power that could be validly granted by the United States." *Id.*, p. 69. And in this view it was decided that so far as the "water powers and appurtenant lots are regarded as property," the title of the Canal Company could not be controverted, and that it was "equally plain that the mode and extent of the use and enjoyment of such property by the Canal Company" fell within the sole control of the United States. See *Kaukauna Water Power Co.* v. *Green Bay Canal Co.,* 142 U. S. 254; *Green Bay Canal Co.* v. *Patten Paper Co.,* 173 U. S. 179.

In *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, the United States had condemned land in Michigan, lying between the St. Marys River and the ship canal strip of the Government, in order to improve navigation. The riparian owner, under revocable permits from the Secretary of War, had placed in the rapids "the necessary dams, dykes and forebays for the purpose of controlling the current and using its power for commerical purposes." *Id.*, p. 68. The Act of March 3, 1909,[17] authorizing the improvement, had revoked the permit. We said that the Government "had dominion over the water power of the rapids and falls" and could not be required to pay "any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use." *Id.*, p. 76. The Act of 1909 also authorized the Secretary of War to lease "any excess of water power which results from the conservation of the flow of the river, and the works which the Government may con-

---

[17] 35 Stat. c. 264, 815, 820, 821.

struct." "If the primary purpose is legitimate," said the Court, "we can see no sound objection to leasing any excess of power over the needs of the Government. The practice is not unusual in respect to similar public works constructed by state governments." *Id.*, p. 73. Reference was made to the case of *Kaukauna Water Power Co.* v. *Green Bay Canal Co., supra,* where the Court had observed in relation to a Wisconsin statute of 1848, which had reserved to the State the water power created by the dam over the Fox River:—"As there is no need of the surplus running to waste, there was nothing objectionable in permitting the State to let out the use of it to private parties, and thus reimburse itself for the expenses of the improvement." In *International Paper Co.* v. *United States,* 282 U. S. 399, the Government made a war-time requisition of electrical power and was held bound to make compensation to a lessee who thereby had lost the use of the water to which he was entitled. The Court brushed aside attempted "distinctions between the taking of power and the taking of water rights," saying that the Government intended "to take and did take the use of all the water power" and had exercised its power of eminent domain to that end. *Id.*, pp. 407, 408.

(2) The argument is stressed that, assuming that electric energy generated at the dam belongs to the United States, the Congress has authority to dispose of this energy only to the extent that it is a surplus necessarily created in the course of making munitions of war or operating the works for navigation purposes; that is, that the remainder of the available energy must be lost or go to waste. We find nothing in the Constitution which imposes such a limitation. It is not to be deduced from the mere fact that the electric energy is only potentially available until the generators are operated. The Government has no less right to the energy thus available by letting the water course over its turbines than it has

to use the appropriate processes to reduce to possession other property within its control, as, for example, oil which it may recover from a pool beneath its lands, and which is reduced to possession by boring oil wells and otherwise might escape its grasp. See *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 208. And it would hardly be contended that, when the Government reserves coal on its lands, it can mine the coal and dispose of it only for the purpose of heating public buildings or for other governmental operations. Or, if the Government owns a silver mine, that it can obtain the silver only for the purpose of storage or coinage. Or that when the Government extracts the oil it has reserved, it has no constitutional power to sell it. Our decisions recognize no such restriction. *United States* v. *Gratiot,* 14 Pet. 526; *Kansas* v. *Colorado,* 206 U. S. 46, 88, 89; *Light* v. *United States,* 220 U. S. 523, 536, 537; *Ruddy* v. *Rossi,* 248 U. S. 104, 106. The United States owns the coal, or the silver, or the lead, or the oil, it obtains from its lands, and it lies in the discretion of the Congress, acting in the public interest, to determine of how much of the property it shall dispose.

We think that the same principle is applicable to electric energy. The argument pressed upon us leads to absurd consequences in the denial, despite the broad terms of the constitutional provision, of a power of disposal which the public interest may imperatively require. Suppose, for example, that in the erection of a dam for the improvement of navigation, it became necessary to destroy a dam and power plant which had previously been erected by a private corporation engaged in the generation and distribution of energy which supplied the needs of neighboring communities and business enterprises. Would anyone say that, because the United States had built its own dam and plant in the exercise of its constitutional functions, and had complete ownership and dominion over both, no power could be supplied to the communities and enterprises dependent on it, not because of

any unwillingness of the Congress to supply it, or of any overriding governmental need, but because there was no constitutional authority to furnish the supply? Or that, with abundant power available, which must otherwise be wasted, the supply to the communities and enterprises whose very life may be at stake must be limited to the slender amount of surplus unavoidably involved in the operation, of the navigation works, because the Constitution does not permit any more energy to be generated and distributed? In the case of the *Green Bay Canal Co.*, above cited, where the government works supplanted those of the Canal Company, the Court found no difficulty in sustaining the Government's authority to grant to the Canal Company the water powers which it had previously enjoyed, subject, of course, to the dominant control of the Government. And in the case of *United States* v. *Chandler-Dunbar Co.,supra,* the statutory provision, to which the Court referred, was "that any excess of water in the St. Marys River at Sault Sainte Marie over and above the amount now or hereafter required for the uses of navigation shall be leased for power purposes by the Secretary of War upon such terms and conditions as shall be best calculated in his judgment to insure the development thereof." It was to the leasing, under this provision, "of any excess of power over the needs of the Government" that the Court saw no valid objection. *Id.*, p. 73.

The decisions which petitioners cite give no support to their contention. *Pollard* v. *Hagan*, 3 How. 212, *Shively* v. *Bowlby*, 152 U. S. 1, and *Port of Seattle* v. *Oregon-Washington R. Co.*, 255 U. S. 56, dealt with the title of the States to tidelands and the soil under navigable waters within their borders. See *Borax Consolidated* v. *Los Angeles*, 296 U. S. 10, 15. Those cases did not concern the dominant authority of the Federal Government in the interest of navigation to erect dams and avail itself of the incidental water power. We emphasized the dominant character of that authority in the case of

the *Green Bay Canal Co., supra,* by this statement, at p. 80: "At what points in the dam and canal the water for power may be withdrawn, and the quantity which can be treated as surplus with due regard to navigation, must be determined by the authority which owns and controls that navigation. In such matters there can be no divided empire." The case of *Wisconsin* v. *Illinois,* 278 U. S. 367, related to the diversion by the State of Illinois of water from Lake Michigan through the drainage canal at Chicago, and the questions now before us with respect to the disposition of surplus energy created at a dam erected by the Federal Government in the performance of its constitutional functions were in no way involved.

(3) We come then to the question as to the validity of the method which has been adopted in disposing of the surplus energy generated at the Wilson Dam. The constitutional provision is silent as to the method of disposing of property belonging to the United States. That method, of course, must be an appropriate means of disposition according to the nature of the property, it must be one adopted in the public interest as distinguished from private or personal ends, and we may assume that it must be consistent with the foundation principles of our dual system of government and must not be contrived to govern the concerns reserved to the States. See *Kansas* v. *Colorado, supra.* In this instance, the method of disposal embraces the sale of surplus energy by the Tennessee Valley Authority to the Alabama Power Company, the interchange of energy between the Authority and the Power Company, and the purchase by the Authority from the Power Company of certain transmission lines.

As to the mere sale of surplus energy, nothing need be added to what we have said as to the constitutional authority to dispose. The Government could lease or sell and fix the terms. Sales of surplus energy to the Power Company by the Authority continued a practice begun by the Government several years before. The contemplated

interchange of energy is a form of disposition and presents no questions which are essentially different from those that are pertinent to sales.

The transmission lines which the Authority undertakes to purchase from the Power Company lead from the Wilson Dam to a large area within about fifty miles of the dam. These lines provide the means of distributing the electric energy, generated at the dam, to a large population. They furnish a method of reaching a market. The alternative method is to sell the surplus energy at the dam, and the market there appears to be limited to one purchaser, the Alabama Power Company, and its affiliated interests. We know of no constitutional ground upon which the Federal Government can be denied the right to seek a wider market. We suppose that in the early days of mining in the West, if the Government had undertaken to operate a silver mine on its domain, it could have acquired the mules or horses and equipment to carry its silver to market. And the transmission lines for electric energy are but a facility for conveying to market that particular sort of property, and the acquisition of these lines raises no different constitutional question, unless in some way there is an invasion of the rights reserved to the State or to the people. We find no basis for concluding that the limited undertaking with the Alabama Power Company amounts to such an invasion. Certainly, the Alabama Power Company has no constitutional right to insist that it shall be the sole purchaser of the energy generated at the Wilson Dam; that the energy shall be sold to it or go to waste.

We limit our decision to the case before us, as we have defined it. The argument is earnestly presented that the Government by virtue of its ownership of the dam and power plant could not establish a steel mill and make and sell steel products, or a factory to manufacture clothing or shoes for the public, and thus attempt to make its

ownership of energy, generated at its dam, a means of carrying on competitive commercial enterprises and thus drawing to the Federal Government the conduct and management of business having no relation to the purposes for which the Federal Government was established. The picture is eloquently drawn but we deem it to be irrelevant to the issue here. The Government is not using the water power at the Wilson Dam to establish any industry or business. It is not using the energy generated at the dam to manufacture commodities of any sort for the public. The Government is disposing of the energy itself which simply is the mechanical energy, incidental to falling water at the dam, converted into the electric energy which is susceptible of transmission. The question here is simply as to the acquisition of the transmission lines as a facility for the disposal of that energy. And the Government rightly conceded at the bar, in substance, that it was without constitutional authority to acquire or dispose of such energy except as it comes into being in the operation of works constructed in the exercise of some power delegated to the United States. As we have said, these transmission lines lead directly from the dam, which has been lawfully constructed, and the question of the constitutional right of the Government to acquire or operate local or urban distribution systems is not involved. We express no opinion as to the validity of such an effort, as to the status of any other dam or power development in the Tennessee Valley, whether connected with or apart from the Wilson Dam; or as to the validity of the Tennessee Valley Authority Act or of the claims made in the pronouncements and program of the Authority apart from the questions we have discussed in relation to the particular provisions of the contract of January 4, 1934, affecting the Alabama Power Company.

The decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE BRANDEIS, concurring.

"Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it." *Blair* v. *United States,* 250 U. S. 273, 279.

I do not disagree with the conclusion on the constitutional question announced by the Chief Justice; but, in my opinion, the judgment of the Circuit Court of Appeals should be affirmed without passing upon it. The Government has insisted throughout the litigation that the plaintiffs have no standing to challenge the validity of the legislation. This objection to the maintenance of the suit is not overcome by presenting the claim in the form of a bill in equity and complying with formal prerequisites required by Equity Rule 27. The obstacle is not procedural. It inheres in the substantive law, in well settled rules of equity, and in the practice in cases involving the constitutionality of legislation. Upon the findings made by the District Court, it should have dismissed the bill.

From these it appears: The Alabama Power Company, a corporation of that State with transmission lines located there, has outstanding large issues of bonds, preferred stock, and common stock. Its officers agreed, with the approval of the board of directors, to sell to the Tennessee Valley Authority a part of these lines and incidental property. The management thought that the transaction was in the interest of the company. It acted in the exercise of its business judgment with the utmost good faith.[1]

---

[1] The management explained that it was in the best interest of the Company to accept the offer of the Authority for the purchase of the transmission lines in a limited area coupled with an agreement

There was no showing of fraud, oppression, or gross negligence. There was no showing of legal duress. There was no showing that the management believed that to sell to the Tennessee Valley Authority was in excess of the Company's corporate powers, or that it was illegal because entered into for a forbidden purpose.

Nor is there any basis in law for the assertion that the contract was *ultra vires* of the Company. Under the law of Alabama, a public utility corporation may ordinarily sell a part of its transmission lines and incidental property to another such corporation if the approval of the Public Service Commission is obtained. The contract provided for securing such approval. Moreover, before the motion to dissolve the restraining order was denied, and before the hearing on the merits was concluded, the Legislature, by Act No. 1, approved January 24, 1935, and effective immediately, provided that a utility of the State may sell all or any of its property to the Tennessee Valley Authority without the approval of the Public Service Commission or of any other state agency.

*First.* The substantive law. The plaintiffs who object own about one-three hundred and fortieth of the preferred stock. They claimed at the hearing to represent about one-ninth of the preferred stock; that is, less than one-forty-fifth in amount of all the securities outstanding. Their rights are not enlarged because the Tennessee Valley Authority entered into the transaction pursuant to

on the part of the Authority not to sell outside of that area during the life of the contract. It protected the Company against possible entrance of the Authority into the territory in which were located nine-tenths of the Company's customers, including the largest; and it assured the Company that so long as the latter retained its urban distribution systems within the territory served by the transmission lines, those systems would be serviced by power from Wilson Dam. Upon delivery of the transmission lines, the Authority agreed to pay the Company $1,150,000.

an act of Congress. The fact that the bill calls for an enquiry into the legality of the transaction does not overcome the obstacle that ordinarily stockholders have no standing to interfere with the management. Mere belief that corporate action, taken or contemplated, is illegal gives the stockholder no greater right to interfere than is possessed by any other citizen. Stockholders are not guardians of the public. The function of guarding the public against acts deemed illegal rests with the public officials.

Within recognized limits, stockholders may invoke the judicial remedy to enjoin acts of the management which threaten their property interest. But they cannot secure the aid of a court to correct what appear to them to be mistakes of judgment on the part of the officers. Courts may not interfere with the management of the corporation, unless there is bad faith, disregard of the relative rights of its members, or other action seriously threatening their property rights. This rule applies whether the mistake is due to error of fact or of law, or merely to bad business judgment. It applies, among other things, where the mistake alleged is the refusal to assert a seemingly clear cause of action, or the compromise of it. *United Copper Securities Co.* v. *Amalgamated Copper Co.*, 244 U. S. 261, 263–264. If a stockholder could compel the officers to enforce every legal right, courts, instead of chosen officers, would be the arbiters of the corporation's fate.

In *Hawes* v. *Oakland*, 104 U. S. 450, 462, a common stockholder sought to enjoin the Contra Costa Waterworks Company from permitting the City of Oakland to take without compensation water in excess of that to which it was legally entitled. This Court, in affirming dismissal of the bill, said: "It may be the exercise of the highest wisdom to let the city use the water in the manner complained of. The directors are better able to act

understandingly on this subject than a stockholder residing in New York. The great body of the stockholders residing in Oakland or other places in California may take this view of it, and be content to abide by the action of their directors. If this be so, is a bitter litigation with the city to be conducted by one stockholder for the corporation and all other stockholders, because the amount of his dividends is diminished?"

In *Corbus* v. *Alaska Treadwell Gold Mining Co.*, 187 U. S. 455, 463, a suit by a common stockholder to enjoin payment of an Alaska license tax alleged to be illegal, the Court said: "The directors represent all the stockholders and are presumed to act honestly and according to their best judgment for the interests of all. Their judgment as to any matter lawfully confided to their discretion may not lightly be challenged by any stockholder or at his instance submitted for review to a court of equity. The directors may sometimes properly waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. They may regard the expense of enforcing the right or the furtherance of the general business of the corporation in determining whether to waive or insist upon the right. And a court of equity may not be called upon at the appeal of any single stockholder to compel the directors or the corporation to enforce every right which it may possess, irrespective of other considerations. It is not a trifling thing for a stockholder to attempt to coerce the directors of a corporation to an act which their judgment does not approve, or to substitute his judgment for theirs."[2]

*Second.* The equity practice. Even where property rights of stockholders are alleged to be violated by the management, stockholders seeking an injunction must

---

[2] See also *Samuel* v. *Holladay*, 21 Fed. Cas. No. 12,288, pp. 306, 311–312.

bear the burden of showing danger of irreparable injury, as do others who seek that equitable relief. In the case at bar the burden of making such proof was a peculiarly heavy one. The plaintiffs, being preferred stockholders, have but a limited interest in the enterprise, resembling, in this respect, that of a bondholder in contradistinction to that of a common stockholder. Acts may be innocuous to the preferred which conceivably might injure common stockholders. There was no finding that the property interests of the plaintiffs were imperiled by the transaction in question; and the record is barren of evidence on which any such finding could have been made.

*Third.* The practice in constitutional cases. The fact that it would be convenient for the parties and the public to have promptly decided whether the legislation assailed is valid, cannot justify a departure from these settled rules of corporate law and established principles of equity practice. On the contrary, the fact that such is the nature of the enquiry proposed should deepen the reluctance of courts to entertain the stockholder's suit. "It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously and with due regard to duty and official oath decline the responsibility."—1 Cooley, Constitutional Limitations (8th ed.), p. 332.

The Court has frequently called attention to the "great gravity and delicacy" of its function in passing upon the validity of an act of Congress;[3] and has restricted exercise of this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory

---

[3] E. g., Miller, J., in *Ex parte Garland,* 4 Wall. 333, 382; *Hepburn* v. *Griswold,* 8 Wall. 603, 610; *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544; Holmes, J., in *Blodgett* v. *Holden,* 275 U. S. 142, 147–148.

opinions.[4] .On this ground it has in recent years ordered the dismissal of several suits challenging the constitutionality of important acts of Congress. In *Texas* v. *Interstate Commerce Comm'n,* 258 U. S. 158, 162, the validity of Titles III and IV of the Transportation Act of 1920. In *New Jersey* v. *Sargent,* 269 U. S. 328, the validity of parts of the Federal Water Power Act. In *Arizona* v. *California,* 283 U. S. 423, the validity of the Boulder Canyon Project Act. Compare *United States* v. *West Virginia,* 295 U. S. 463, involving the Federal Water Power Act, and *Liberty Warehouse Co.* v. *Grannis,* 273 U. S. 70, where this Court affirmed the dismissal of a suit to test the validity of a Kentucky statute concerning the sale of tobacco; also. *Massachusetts State Grange* v. *Benton,* 272 U. S. 525.

The Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision. They are:

1. The Court will not pass upon the constitutionality of legislation in a friendly, non-adversary, proceeding, declining because to decide such questions "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act." *Chicago & Grand Trunk Ry.* v. *Wellman,* 143 U. S. 339, 345. Compare *Lord* v. *Veazie,* 8 How. 251; *Atherton Mills* v. *Johnston,* 259 U. S. 13, 15.

2. The Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it."

---

[4] E. g., *Hayburn's Case,* 2 Dall. 409; *United States* v. *Ferreira,* 13 How. 40; *Gordon* v. *United States,* 2 Wall. 561, 117 U. S. 697; *Muskrat* v. *United States,* 219 U. S. 346; *Willing* v. *Chicago Auditorium Assn.,* 277 U. S. 274.

*Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Commissioners,* 113 U. S. 33, 39;[5] *Abrams* v. *Van Schaick,* 293 U. S. 188; *Wilshire Oil Co.* v. *United States,* 295 U. S. 100. "It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton* v. *United States,* 196 U. S. 283, 295.

3. The Court will not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Commissioners, supra.* Compare *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 169–172.

4. The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. *Siler* v. *Louisville & Nashville R. Co.,* 213 U. S. 175, 191; *Light* v. *United States,* 220 U. S. 523, 538. Appeals from the highest court of a state challenging its decision of a question under the Federal Constitution are frequently dismissed because the judgment can be sustained on an independent state ground. *Berea College* v. *Kentucky,* 211 U. S. 45, 53.

5. The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation.[6] *Tyler* v. *The Judges,* 179 U.

---

[5] E. g., *Ex parte Randolph,* 20 Fed. Cas. No. 11,558, pp. 242, 254; *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 553; *Trade-Mark Cases,* 100 U. S. 82, 96; *Arizona* v. *California,* 283 U. S. 423, 462–464.

[6] E. g., *Hatch* v. *Reardon,* 204 U. S. 152, 160–161; *Corporation Commission* v. *Lowe,* 281 U. S. 431, 438; *Heald* v. *District of Columbia,* 259 U. S. 114, 123; *Sprout* v. *South Bend,* 277 U. S. 163, 167; *Concordia Fire Insurance Co.* v. *Illinois,* 292 U. S. 535, 547.

S. 405; *Hendrick* v. *Maryland,* 235 U. S. 610, 621. Among the many applications of this rule, none is more striking than the denial of the right of challenge to one who lacks a personal or property right. Thus, the challenge by a public official interested only in the performance of his official duty will not be entertained. *Columbus & Greenville Ry.* v. *Miller,* 283 U. S. 96, 99–100. In *Fairchild* v. *Hughes,* 258 U. S. 126, the Court affirmed the dismissal of a suit brought by a citizen who sought to have the Nineteenth Amendment declared unconstitutional. In *Massachusetts* v. *Mellon,* 262 U. S. 447, the challenge of the federal Maternity Act was not entertained although made by the Commonwealth on behalf of all its citizens.

6. The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits.[7] *Great Falls Mfg. Co.* v. *Attorney General,* 124 U. S. 581; *Wall* v. *Parrot Silver & Copper Co.,* 244 U. S. 407, 411–412; *St. Louis Malleable Casting Co.* v. *Prendergast Construction Co.,* 260 U. S. 469.

7. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell* v. *Benson,* 285 U. S. 22, 62.[8]

---

[7] Compare *Electric Co.* v. *Dow,* 166 U. S. 489; *Pierce* v. *Somerset Ry.,* 171 U. S. 641, 648; *Leonard* v. *Vicksburg, S. & P. R. Co.,* 198 U. S. 416, 422.

[8] E. g., *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366, 407–408; *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401; *Baender* v. *Barnett,* 255 U. S. 224; *Texas* v. *Eastern Texas R. Co.,* 258 U. S. 204, 217; *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 390; *Linder* v. *United States,* 268 U. S. 5, 17–18; *Missouri Pacific R. Co.* v. *Boone,* 270 U. S. 466, 471–472; *Richmond Screw Anchor Co.* v. *United States,* 275 U. S. 331, 346; *Blodgett* v. *Holden,* 275 U. S. 142, 148; *Lucas* v. *Alexander,* 279 U. S. 573, 577; *Interstate Commerce Comm'n* v. *Oregon-Washington R. & N. Co.,* 288 U. S. 14, 40.

*Fourth.* I am aware that, on several occasions, this Court passed upon important constitutional questions which were presented in stockholders' suits bearing a superficial resemblance to that now before us. But in none of those cases was the question presented under circumstances similar to those at bar. In none, were the plaintiffs preferred stockholders. In some, the Court dealt largely with questions of federal jurisdiction and collusion. In most, the propriety of considering the constitutional question was not challenged by any party. In most, the statute challenged imposed a burden upon the corporation and penalties for failure to discharge it; whereas the Tennessee Valley Authority Act imposed no obligation upon the Alabama Power Company, and under the contract it received a valuable consideration. Among other things, the Authority agreed not to sell outside the area covered by the contract, and thus preserved the corporation against possible serious competition. The effect of this agreement was equivalent to a compromise of a doubtful cause of action. Certainly, the alleged invalidity of the Tennessee Valley Authority Act was not a matter so clear as to make compromise illegitimate. These circumstances present features differentiating the case at bar from all the cases in which stockholders have been held entitled to have this Court pass upon the constitutionality of a statute which the directors had refused to challenge. The cases commonly cited are these: [9]

*Dodge* v. *Woolsey,* 18 How. 331, 341–346, was a suit brought by a common stockholder to enjoin a breach of trust by the directors which, if submitted to, would seriously injure the plaintiff. The Court drew clearly the distinction between "an error of judgment" and a breach

---

[9] Others are *Memphis* v. *Dean,* 8 Wall. 64, 73; *Smyth* v. *Ames,* 169 U. S. 466, 515–518; *Corbus* v. *Alaska Treadwell Gold Mining Co.,* 187 U. S. 455; *Ex parte Young,* 209 U. S. 123, 143; *Delaware & Hudson Co.* v. *Albany & Susquehanna R. Co.,* 213 U. S. 435; *Wathen* v. *Jackson Oil & Refining Co.,* 235 U. S. 635.

of duty; declared that it could not interfere if there was only an error of judgment; held that on the facts the threatened action of the directors would be a breach of trust; and pointed to the serious injury necessarily resulting therefrom to the plaintiff.[10]

*Greenwood* v. *Freight Co.*, 105 U. S. 13, 15–16, was a suit brought by a common stockholder to enjoin the enforcement of a statute alleged to be unconstitutional as repealing the corporation's charter. The Court said: "It is sufficient to say that this bill presents so strong a case of the total destruction of the corporate existence . . . that we think the complainant as a stockholder comes within the rule . . . which authorizes a shareholder to maintain a suit to prevent such a disaster, where the corporation peremptorily refuses to move in the matter."

*Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 553–554, was a suit brought by a common stockholder to enjoin a breach of trust by paying voluntarily a tax which was said to be illegal. The stockholder's substantive right to object was not challenged. The question raised was that of equity jurisdiction. The allegation of threatened irreparable damage to the corporation and

---

[10] The resolution of the directors (p. 340) was this: "Resolved, that we fully concur in the views expressed in said letter as to the illegality of the tax therein named, and believe it to be in no way binding upon the bank; but, in consideration of the many obstacles in the way of testing the law in the courts of the State, we cannot consent to take the action which we are called upon to take, but. must leave the said Kleman to pursue such measures as he may deem best in the premises." Referring to *Dodge* v. *Woolsey*, the Court pointed out in *Hawes* v. *Oakland*, 104 U. S. 450, 459: "As the law then stood there was no means by which the bank, being a citizen of the same State with Dodge, the tax-collector, could bring into a court of the United States the right which it asserted under the Constitution, to be relieved of the tax in question, except by writ of error to a State court from the Supreme Court of the United States."

to the plaintiff was admitted. The Court said: "The objection of adequate remedy at law was not raised below, nor is it now raised by appellees, if it could be entertained at all at this stage of the proceedings; and, so far as it was within the power of the government to do so, the question of jurisdiction, for the purposes of the case, was explicitly waived on the argument. . . . Under these circumstances, we should not be justified in declining to proceed to judgment upon the merits." The jurisdictional issue discussed in the dissent (157 U. S. at 608–612) was the effect of R. S. § 3224.

*Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79, 113, was a suit brought by a common stockholder to enjoin enforcement of a rate statute alleged to be unconstitutional against which the directors refused to protect the corporation. It was alleged and found that its enforcement would subject the company to great and irreparable loss. The serious contention concerning jurisdiction was, as stated by Mr. Justice Brewer, whether a suit lay against the Attorney General of the State. Of the jurisdiction of the suit "as one involving a controversy between the stockholders and the corporation and its officers, no serious question is made."

*Chicago* v. *Mills,* 204 U. S. 321, was a suit brought by a common stockholder of the People's Gas, Light and Coke Company to enjoin enforcement of an ordinance alleged to be illegal. The sole question before this Court was whether the federal court had jurisdiction. That question raised an issue of fact. This Court in affirming the judgment below said (p. 331): "Upon the whole record we agree with the Circuit Court that the testimony does not disclose that the jurisdiction of the Federal court was collusively and fraudulently invoked. . . ."

*Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 9–10, was a suit brought by a common stockholder to restrain the corporation from voluntarily paying a tax alleged to

be invalid. As stated by plaintiff's counsel: "The contention is—and this is the only objection that is made to the suit—that it seeks to do indirectly what the Revised Statutes [§ 3224] have said shall not be done; namely, enjoin the collection of a tax." The Court, assuming that the averments were identical with those in the *Pollock* case, declared that the right of the stockholder to sue was clear.

*Smith* v. *Kansas City Title & Trust Co.*, 255 U. S. 180, 199–202, was a suit brought by a common stockholder to enjoin investment by the company in bonds issued under the Federal Farm Loan Act. Neither the parties, nor the government which filed briefs as *amicus*, made any objection to the jurisdiction. But as both parties were citizens of Missouri, the Court raised, and considered fully, the question whether there was federal jurisdiction under § 24 of the Judicial Code. It was on this question that Mr. Justice Holmes and Mr. Justice McReynolds dissented. The Court held that there was federal jurisdiction; and upon averments of the bill, assumed to be adequate, sustained the right of the stockholder to invoke the equitable remedy on the authority of the *Brushaber* and *Pollock* cases.

*Hill* v. *Wallace*, 259 U. S. 44, 60–63, was a suit by members of the Board of Trade of Chicago to restrain enforcement of the Future Trading Act, alleged to be unconstitutional. The Court held that the averments of the bill, which included allegations of irreparable injury, stated "sufficient equitable grounds to justify granting the relief" on the cases above cited.

If, or in so far as, any of the cases discussed may be deemed authority for sustaining this bill, they should now be disapproved. This Court, while recognizing the soundness of the rule of *stare decisis* where appropriate, has not hesitated to overrule earlier decisions shown, upon fuller

consideration, to be erroneous.[11] Our present keener appreciation of the wisdom of limiting our decisions rigidly to questions essential to the disposition of the case before the court is evidenced by *United States* v. *Hastings,* 296 U. S. 188, decided at this term. There, we overruled *United States* v. *Stevenson,* 215 U. S. 190, 195, long a controlling authority on the Criminal Appeals Act.

*Fifth.* If the Company ever had a right to challenge the transaction with the Tennessee Valley Authority, its right had been lost by estoppel before this suit was begun; and as it is the Company's right which plaintiffs seek to enforce, they also are necessarily estopped. The Tennessee Valley Authority Act became a law on May 18, 1933. Between that date and January, 1934, the Company and its associates purchased approximately 230,000,-000 kwh electric energy at Wilson Dam. Under the contract of January 4, 1934, which is here assailed, continued purchase of Wilson Dam power was provided for and made; and the Authority has acted in other matters in reliance on the contract. In May, 1934, the Company applied to the Alabama Public Service Commission for approval of the transfers provided for in the contract; and on June 1, 1934, the Commission made in general terms its finding that the proposed sale of the properties was consistent with the public interest. Moreover, the plaintiffs in their own right are estopped by their long inaction. Although widespread publicity was given to the negotiations for the contract and to these later pro-

---

[11] A notable recent example is *Humphrey's Executor* v. *United States,* 295 U. S. 602, which limited (p. 626 *et seq.*) *Myers* v. *United States,* 272 U. S. 52, disapproving important statements in the opinion. For lists of decisions of this Court later overruled, see *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 406–409; Malcolm Sharp, Movement in Supreme Court Adjudication—A Study of Modified and Overruled Decisions, 46 Harv. L. Rev. 361, 593, 795.

ceedings, the plaintiffs made no protest until August 7, 1934; and did not begin this suit until more than eight months after the execution of the contract. Others—certain ice and coal companies who thought they would suffer as competitors—appeared before the Commission in opposition to the action of the Authority; and apparently they are now contributing to the expenses of this litigation.

*Sixth.* Even where by the substantive law stockholders have a standing to challenge the validity of legislation under which the management of a corporation is acting, courts should, in the exercise of their discretion, refuse an injunction unless the alleged invalidity is clear. This would seem to follow as a corollary of the long established presumption in favor of the constitutionality of a statute.

Mr. Justice Iredell said, as early as 1798, in *Calder* v. *Bull*, 3 Dall. 386, 399: "If any act of Congress, or of the Legislature of a state, violates those constitutional provisions, it is unquestionably void; though, I admit, that as the authority to declare it void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case."

Mr. Chief Justice Marshall said, in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 625: "On more than one occasion, this Court has expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared, that, in no doubtful case, would it pronounce a legislative act to be contrary to the constitution." [12]

---

[12] In 1811, Chief Justice Tilghman of the Supreme Court of Pennsylvania, while asserting the power of the court to hold laws unconstitutional, but declining to exercise it in a particular case, stated the practice as follows: "For weighty reasons, it has been assumed as a principle in constitutional construction by the Supreme Court of the United States, by this court, and every other court of reputation in the United States, that an Act of the legislature is not to be

Mr. Justice Washington said, in *Ogden* v. *Saunders*, 12 Wheat. 213, 270: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt. This has always been the language of this Court, when that subject has called for its decision; and I know that it expresses the honest sentiments of each and every member of this bench."

Mr. Chief Justice Waite said in the *Sinking-Fund Cases*, 99 U. S. 700, 718: "This declaration [that an act of Congress is unconstitutional] should never be made except in a clear case. Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule."

The challenge of the power of the Tennessee Valley Authority rests wholly upon the claim that the act of

declared void, unless the violation of the constitution is so manifest as to leave no room for reasonable doubt." James B. Thayer, after quoting the passage in The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv. Law Review 129, 140, called attention (p. 144) to "a remark of Judge Cooley, to the effect that one who is a member of a legislature may vote against a measure as being, in his judgment, unconstitutional; and, being subsequently placed on the bench, when this measure having been passed by the legislature in spite of his opposition, comes before him judicially, may there find it his duty, although he has in no degree changed his opinion, to declare it constitutional."

Congress which authorized the contract is unconstitutional. As the opinions of this Court and of the Circuit Court of Appeals show, that claim was not a matter "beyond peradventure clear." The challenge of the validity of the Act is made on an application for an injunction— a proceeding in which the court is required to exercise its judicial discretion. In proceedings for a mandamus, where, also, the remedy is granted not as a matter of right but in the exercise of a sound judicial discretion, *Duncan Townsite Co.* v. *Lane,* 245 U. S. 308, 311–312, courts decline to enter upon the enquiry when there is a serious doubt as to the existence of the right or duty sought to be enforced. As was said in *United States* v. *Interstate Commerce Comm'n,* 294 U. S. 50, 63: "Where the matter is not beyond peradventure clear we have invariably refused the writ [of mandamus], even though the question were one of law as to the extent of the statutory power of an administrative officer or body." *A fortiori* this rule should have been applied here where the power challenged is that of Congress under the Constitution.

Mr. Justice Stone, Mr. Justice Roberts, and Mr. Justice Cardozo join in this opinion.

Separate opinion of Mr. Justice McReynolds.

Considering the consistent rulings of this court through many years, it is not difficult for me to conclude that petitioners have presented a justiciable controversy which we must decide. In *Smith* v. *Kansas City Title Co.,* 255 U. S. 180, the grounds for jurisdiction were far less substantial than those here disclosed. We may not with propriety avoid disagreeable duties by lightly forsaking long respected precedents and established practice.

Nor do I find serious difficulty with the notion that the United States, by proper means and for legitimate ends,

may dispose of water power or electricity honestly developed in connection with permissible improvement of navigable waters. But the means employed to that end must be reasonably appropriate in the circumstances. Under pretense of exercising granted power, they may not in fact undertake something not intrusted to them. Their mere ownership, e. g., of an iron mine would hardly permit the construction of smelting works followed by entry into the business of manufacturing and selling hardware, albeit the ore could thus be disposed of, private dealers discomfited and artificial prices publicized. Here, therefore, we should consider the truth of petitioners' charge that, while pretending to act within their powers to improve navigation, the United States, through corporate agencies, are really seeking to accomplish what they have no right to undertake—the business of developing, distributing and selling electric power. If the record sustains this charge, we ought so to declare and decree accordingly.

The Circuit Court of Appeals took too narrow a view of the purpose and effect of the contract of January 4, 1934. That went far beyond the mere acquisition of transmission lines for proper use in disposing of power legitimately developed. Like all contracts, it must be considered as a whole, illumined by surrounding circumstances. Especial attention should be given to the deliberately announced purpose of Directors, clothed with extraordinary discretion and supplied with enormous sums of money. With $50,000,000 at their command they started out to gain control of the electrical business in large areas and to dictate sale prices. The power at Wilson Dam was the instrumentality seized upon for carrying the plan into effect.

While our primary concern is with this contract, it cannot be regarded as a mere isolated effort to dispose of property. And certainly to consider only those provisions

which directly relate to Alabama Power Company is not permissible. We must give attention to the whole transaction—its antecedents, purpose and effect—as well as the terms employed.

No abstract question is before us; on the contrary, the matter is of enormous practical importance to petitioners—their whole investment is at stake. Properly understood, the pronouncements, policies and program of the Authority illuminate the action taken. They help to reveal the serious interference with the petitioners' rights. Their property was in danger of complete destruction under a considered program commenced by an agency of the National Government with vast resources subject to its discretion and backed by other agencies likewise intrusted with discretionary use of huge sums. The threat of competition by such an opponent was appalling. The will to prevail was evident. No private concern could reasonably hope to withstand such force.

The Tennessee River, with headwaters in West Virginia and North Carolina, crosses Tennessee on a southwesterly course, enters Alabama near Chattanooga, and flows westerly across the northern part of that State to the northeast corner of Mississippi. There it turns northward, passes through Tennessee and Kentucky, and empties into the Ohio forty miles above Cairo. The total length is nine hundred miles; the drainage basin approximates forty thousand square miles. The volume of water is extremely variable; commercial navigation is of moderate importance.

At Muscle Shoals, near Florence, Alabama (twenty miles east of the Mississippi line and fifteen south of Tennessee), a succession of falls constitutes serious interference with navigation; also presents possibilities for development of power on a large scale. During and immediately after the World War, a great dam was constructed there by the United States, intended primarily for genera-

tion of power. Production of electricity soon commenced. Some of this was devoted to governmental purposes; much was sold, delivery being made at or near the dam.

During the last thirty years, several corporations have been engaged in the growing business of developing electric energy and distributing this to customers over a network of interconnected lines extending throughout Tennessee, Georgia, Alabama and Mississippi. At great expense they gradually built up extensive businesses and acquired properties of very large value. All operated under state supervision. Through stock ownership or otherwise, they came under general control of the Commonwealth & Southern Corporation. Among the associates were the Alabama Power Company which serviced Alabama; the Mississippi Company which serviced Mississippi; and the Tennessee Company which operated in eastern Tennessee. Huge sums were invested in these enterprises by thousands of persons in many states. Apparently, the companies were diligently developing their several systems and responding to the demands of the territories which they covered.

In 1933, operations began under an imposing program for somewhat improving Tennessee River navigation and especially for developing the water power along its whole course at public expense. This plan involved conversion of water power into electricity for wide distribution throughout the valley and adjacent territory. Its development was intrusted to the Tennessee Valley Authority, a federal corporation wholly controlled by the United States. This promptly took over the Wilson Dam and began work upon the Wheeler Dam, twenty miles up the River, and the Pickwick Dam, some forty miles lower down. Also it commenced construction of Norris Dam across Clinch River, a branch of the Tennessee, two hundred miles above the Wilson Dam. All these, with probable additions, were to be connected by transmission wires,

and electric energy distributed from them to millions of people in many states. Public service corporations were to be brought to terms or put out of business. At least $75,000,000 of public funds was early appropriated for expenditure by the Directors; and other governmental agencies in control of vast sums were ready to lend aid.

Readily to understand the issues now before us, one must be mindful of these circumstances.

The trial court made findings of fact which fill more than sixty printed pages. They are not controverted and for present purposes are accepted; upon them the cause stands for decision. They are much quoted below. Plainly they indicate, and that court, in effect, declared, the contract of January 4th was a deliberate step into a forbidden field, taken with definite purpose to continue the trespass.

Nothing suggests either necessity or desirability of entering into this agreement solely to obtain solvent customers willing to pay full value for all surplus power generated at Wilson Dam. Apparently, there was ample opportunity for such sales, deliveries to be made at or near the dam. No attempt was made to show otherwise. The definite end in view was something other than orderly disposition.

The Authority's Answer to the Complaint is little more than a series of denials. It does not even allege that the contract of January 4th was necessary for ready disposal of power; or that thereby better prices could be obtained; or that no buyer was ready, able and willing to take at the dam for full value; or that the Board expected to derive adequate return from the business to be acquired. No sort of explanation of the contract is presented—why it was entered into or whether profitable use probably could be made of the property. And I find in the Authority's brief no serious attempt to justify the purchases because necessary or in fact an advantageous method for dispos-

ing of property. Nothing in the findings lends support to any such view.

The record leaves no room for reasonable doubt that the primary purpose was to put the Federal Government into the business of distributing and selling electric power throughout certain large districts, to expel the power companies which had long serviced them, and to control the market therein. A government instrumentality had entered upon a pretentious scheme to provide a "yardstick" of the fairness of rates charged by private owners, and to attain "no less a goal than the electrification of America." "When we carry this program into every town and city and village, and every farm throughout the country, we will have written the greatest chapter in the economic, industrial and social development of America." Any reasonable doubt concerning the purpose and result of the Contract of January 4th or of the design of the Authority should be dispelled by examination of its Reports for 1934 and 1935.*

---

* From the Annual Report, T. V. A. Board for 1934, pp. 23, 24, 25, 26, 27, and 28.

To provide a workable and economic basis of operations, the Authority plans initially to serve certain definite regions and to develop its program in those areas before going outside.

The initial areas selected by the Authority may be roughly described as (a) the region immediately proximate to the route of the transmission line soon to be constructed by the Authority between Muscle Shoals and the site of Norris Dam; (b) the region in proximity to Muscle Shoals, including northern Alabama and northeastern Mississippi; and (c) the region in the proximity of Norris Dam (the new source of power to be constructed by the Authority on the Clinch River in northeast Tennessee).

At a later stage in the development it is contemplated to include, roughly, the drainage area of the Tennessee River in Kentucky, Alabama, Georgia, and North Carolina, and that part of Tennessee which lies east of the west margin of the Tennessee drainage area.

To make the area a workable one and a fair measure of public ownership, it should include several cities of substantial size (such as Chattanooga and Knoxville) and, ultimately, at least one city of more

"The conception was to establish an independent network comparable in all respects with the electric utility system serving the area, with which TVA sought to establish interchange arrangements, both as outlets for its

---

than a quarter million, within transmission distance, such as Birmingham, Memphis, Atlanta, or Louisville.

While it is the Authority's present intention to develop its power program in the above-described territory before considering going outside, the Authority may go outside the area if there are substantial changes in general conditions, facts, or governmental policy, which would necessarily require a change in this policy of regional development, or if the privately owned utilities in the area do not coöperate in the working out of the program.

The Authority entered into a 5-year contract on January 4, 1934, with the Commonwealth & Southern Corporation and its Alabama, Tennessee, Georgia, and Mississippi subsidiaries. The contract covered options to purchase electric properties in certain counties of Alabama, Mississippi, and Tennessee, the sale of distribution systems to municipalities in these counties, restrictions on territorial expansion by the contracting parties, the interchange of power, and other matters.

*Alabama properties.*—All of the low-tension (44,000 volts or lower) transmission lines, substations, rural lines, and rural distribution systems of the Alabama Power Co., in the counties of Lauderdale, Colbert, Lawrence, Limestone, and Morgan (except the Hulaco area), were included in the contract; also those in the north half of Franklin County, including the town of Red. Bay, and the territory in the northern part of Cullman County served by a line of the Alabama Power Co. extending south from Decatur. The price of these properties was set at $1,101,256. The purchase had not been completed at the end of the fiscal year.

The power company agreed to attempt to sell the local distribution systems in the above counties to the respective municipalities, the Authority reserving the right to serve them if sales were not consummated within 3 months of bona fide negotiation and effort. Because of the failure of any [many] of the municipalities in northern Alabama to consummate negotiations for the purchase of the distribution systems serving them, the Authority entered into negotiations for the direct purchase of these distribution systems, but a purchase contract had not been completed on June 30.

*Mississippi properties.*—The contract covered all of the properties of the Mississippi Power Co. in the counties of Pontotoc, Lee, Ita-

own power and to use existing systems as a stand-by or back-up service."

"The TVA plan as conceived and in process of execution contemplates complete and exclusive control and jurisdiction over all power sites on the Tennessee River

---

wamba, Union, Benton, Tippah, Prentiss, Tishomingo, and Alcorn, except a dam site on the Tennessee River in Tishomingo County. The purchase price was $850,000. The purchase was completed and delivery was accepted on June 1, 1934.

The transmission and generation facilities acquired in Mississippi and to be retained as part of the Authority's system include the following:

| | | |
|---|---|---|
| 44,000-volt transmission lines.........................miles | | 63 |
| 44,000-volt substations.................................... | | 6 |
| 22,000-volt transmission lines........................miles | | 45 |
| 22,000-volt substations.................................... | | 4 |
| Tupelo steam stand-by generating plant....Kilovolt-amperes | | 4,374 |
| Corinth steam stand-by generating plant..... | do | 2,225 |
| Blue Mountain Diesel generating plant...... | do | 150 |
| Myrtle Diesel generating plant.............. | do | 75 |

Part of the local distribution facilities acquired in Mississippi were sold prior to the end of the fiscal year and it is expected that all will be sold eventually, as noted hereafter.

*Tennessee properties.*—The contract covered all of the properties of the Tennessee Electric Power Co. in the counties of Anderson, Campbell, Morgan (except the lines extending into Morgan County from Harriman), and Scott; also those in the west portion of Claiborne County, and the 66,000-volt transmission line from Anderson County to Knoxville. The price of these properties was set at $900,000. The purchase had not been completed at the end of the fiscal year.

Negotiations were carried on diligently for several months with the National Power & Light Co., an affiliate of the Electric Bond & Share Co., in an endeavor to acquire the eastern Tennessee electric properties of the Tennessee Public Service Co., a subsidiary of the National Power & Light Co. The electric distribution system in the city of Knoxville is included in these properties. The negotiations resulted in a contract after the end of the fiscal year.

Construction of rural electric lines in northern Alabama and northeastern Mississippi was commenced in the latter part of 1933 with relief labor, the Authority furnishing supervision and materials.

and tributaries." "The TVA policy contemplates full corporate discretion by TVA in developing, executing and extending its electric system and service within transmission limits." "This policy contemplated service utility in type and covered not only generation but transmission and distribution (preferably through public or non-profit agencies, if available) both wholesale and retail. That is,

---

Relief labor was withdrawn on February 15, 1934, after which date the work was continued by the Authority with its own forces. Approximately 93.5 miles of rural electric lines were under construction in Lauderdale and Colbert Counties, Ala., on June 30, and approximately 127 miles in Lee, Pontotoc, Alcorn, Itawamba, Prentiss, Monroe, and Tishomingo Counties, Miss.

A standard form of 20-year contract was devised to govern the sale of power at wholesale to municipal distribution systems, and was first used in a contract with the city of Tupelo, Miss. The Tupelo contract has been published by the Authority and is available for distribution.

Annual Report, T. V. A. 1935, pp. 29, 30—

The Authority has devoted special attention during the year to the problems of rural electrification, as required by section 10 of the act. By the close of the fiscal year 200 miles of rural electric line had been built, and 181 additional miles were in process of construction. These lines are divided among the various counties as follows:

| Alabama: | Miles completed | Miles in progress |
| --- | --- | --- |
| Colbert | 19 | 15 |
| Lauderdale | 72 | .. |
| Mississippi: | | |
| Alcorn | 41 | 29 |
| Lee and Itawamba | 41 | 26 |
| Pontotoc | 27 | .. |
| Prentiss | .. | 7 |
| Tennessee: | | |
| Lincoln | .. | 104 |
| Total | 200 | 181 |

In addition to the above, a number of the rural lines purchased from the Mississippi Power Co. were rehabilitated in order to improve operating and safety conditions, and to provide for increases in load. Also, additional customers were connected to all existing rural lines.

moreover, implicit in both the January 4 contract and the now terminated August 9th contract."

The challenged contract is defended upon the theory that the "Federal Government may dispose of the surplus water power necessarily created by Wilson Dam and may authorize generation of electric energy and acquisition of transmission lines as means of facilitating this disposal." But to facilitate disposal was not the real purpose; obviously the thing to be facilitated was carrying on business by use of the purchased property. Under the guise of disposition something wholly different was to be accomplished—devotion of electric power to purposes beyond the sphere of proper federal action, an unlawful goal. There is no plausible claim that such a contract was either necessary or desirable merely to bring about the sale of property. This Court has often affirmed that facts, not artifice, control its conclusions. The Agency has stated quite clearly the end in view: "This public operation is to serve as a yardstick by which to measure the fairness of electric rates." "The TVA power policy was not designed or limited with a view to the marketing of the power produced and available at Muscle Shoals." "In formulating and going forward with the power policy the Board was considering that policy as a permanent and independent commercial function."

For present purposes a complete survey of relevant circumstances preceding the contract of January 4th and all its consequences is not essential. The pleadings and findings fairly outline the situation. What follows is mainly quoted or derived from them.

The Act of May 18, 1933, created the Tennessee Valley Authority as a body corporate "for the purpose of maintaining and operating the properties now owned by the United States in the vicinity of Muscle Shoals, Alabama, in the interest of the national defense and for agricultural

and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." It provided, a board of three directors "shall direct the exercise of all the powers of the Corporation," and "is authorized to make alterations, modifications or improvements in existing plants and facilities, and to construct new plants"; and to "produce, distribute, and sell electric power as herein particularly specified." The Corporation "shall have such powers as may be necessary or appropriate for the exercise of the powers herein specifically conferred upon the Corporation"; "to acquire real estate for the construction of dams, reservoirs, transmission lines, power houses, and other structures, and navigation projects at any point along the Tennessee River, or any of its tributaries.

Also, the Board is "hereby empowered and authorized to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, the board is authorized to enter into contracts for such sale for a term not exceeding twenty years." "In order to promote and encourage the fullest possible use of electric light and power on farms within reasonable distance of any of its transmission lines the board in its discretion shall have power to construct transmission lines to farms and small villages that are not otherwise supplied with electricity at reasonable rates, and to make such rules and regulations governing such sale and distribution of such electric power as in its judgment may be just and equitable."

"One of the first corporate acts of TVA after its organization was to formulate and announce a power policy to govern the commercial distribution of electric power by TVA. The evidence establishes the fact that the Board

from the outset has considered that it has general corporate discretion as to the establishment and extension of its electric power policy. In establishing a power policy the Board was not primarily considering merely the question of disposal of power produced at Muscle Shoals no longer required for governmental purposes as a result of over-building, obsolescence of plants, or termination of war purpose. Nor was it considering disposal of prospective increases in electric power to be unavoidably created in excess of some governmental requirement. It was considering the matter from the standpoint of the successful establishment and permanent operation of an independent and well rounded government-owned electric distribution system and the general civic, social, and industrial planning and development of the Tennessee Valley region as a whole."

"Under date of August 25, 1933, TVA announced its power policy, indicating both the initial stage of its development and certain later steps originally determined upon. . . . This power policy had not been rescinded or abandoned or modified at the time of submission of this cause."

"In September, 1933, the Authority announced its wholesale and retail rate schedules, which are shown by the evidence to be materially lower than corresponding schedules of the existing utilities in the area. Following this action numerous municipalities in the area began to make efforts to construct municipal systems with which to distribute TVA current, and Public Works Administration (called PWA) gave assurances of favorable consideration of applications for loans to that end."

Under such circumstances, Commonwealth & Southern Corporation negotiated the January 4th contract for its operating subsidiaries—Alabama Power Company, Georgia Power Company, Mississippi Power Company, and Tennessee Electric Power Company.

This recited that the Alabama Company, the Mississippi Company and the Tennessee Company desired to sell, and the Authority desired to purchase, certain land, buildings and physical properties devoted to the generation, transmission and distribution of electricity, together with certain franchises, contracts and going business.

The Alabama Company agreed to sell for $1,000,000 all of its low tension (44 KV or lower) transmission lines, substations (including the high tension station at Decatur and the Sheffield Steam Plant Station) and all rural lines and rural distribution systems in five Alabama counties and parts of two others. [These counties are northwestern Alabama and lie on both sides of the Tennessee River for eighty miles or more.]

The Mississippi Company, in consideration of $850,000, agreed to transfer all of its transmission and distribution lines, substations, generating plants and other property in Pontotoc, Lee, Itawamba, Union, Benton, Tippah, Prentiss, Tishomingo and Alcorn counties (except one dam site in Tishomingo County) State of Mississippi, used in connection with the generation, transmission, distribution or sale of electrical energy. [These counties are the northeastern section of the state, a territory sixty miles square.]

For $900,000, the Tennessee Company agreed to convey its transmission and distribution lines, substations, distribution systems and other properties used in connection with the transmission, distribution and sale of electrical energy in Anderson, Campbell, Morgan and Scott counties, East Tennessee, and "all of the 66 KV transmission line from Cove Creek to Knoxville." [These counties are in the mountains northward from Knoxville within a radius of about sixty miles. They lie northeast of Muscle Shoals and some points therein are much more than a hundred miles from Wilson Dam. They have a population of 86,000.]

The power companies agreed, that "any conveyance of property shall include not only the physical property, easements and rights-of-way, but shall also include all machinery, equipment, tools and working supplies set forth in the respective exhibits, and all franchises, contracts and going business relating to the use of any of said properties." Also, "to transfer or secure the transfer of said franchises, contracts and going business, and to transfer said properties with all present customers attached, so far as they are able." Also, "that during the period of this contract none of said companies will sell electric energy to any municipality, corporation, partnership, association or individual in any portion of the above-described counties or parts thereof in Alabama, Tennessee and Mississippi," etc. The Authority agreed not to sell electric energy outside of the specified counties to the customers of non-utilities supplied by the power companies.

Other covenants provided for interchange of electric energy between the contracting parties and for coöperation in the sale of electric appliances throughout the entire territory served by the power companies.

"Power Companies covenant and agree that after the expiration of this agreement the interchange arrangement then in effect will be maintained by Power Companies for an additional period (not exceeding eighteen months) sufficient to permit Authority to construct its own transmission facilities for serving all of the territory which it is then serving in whole or in part with power obtained at such interchange points."

"Power Companies agree to have available at all times for exchange, at each point of exchange, energy and capacity to supply the entire demands of the customers served by Authority from such points of exchange, subject to the limitations as to transmission capacity set forth in Section 10 (h) hereof; Provided, that the maxi-

mum amount which Authority shall be entitled to demand at all points of exchange shall be 70,000 k.v."

Prior to the agreement for sale The Alabama Company had derived $750,000 gross annual revenue from its properties located within the "ceded area." . This district had a population of 190,000; and the Company had therein 10,000 individual customers—approximately 1/10 of all those directly served by it. The lines transferred by the Mississippi Power Company served directly 4,000 customers in 9 counties, having total population of 184,000. When this cause began, the Mississippi properties were being operated by TVA and rural lines were in process of extension by it in both Mississippi and Alabama.

"All of the electric properties and facilities covered by the contract of January 4, 1934, . . . were contracted for by TVA for the purpose of continuing and enlarging the utility service for which they were used by the respective power companies."

. "The operation of a commercial utility service by TVA and the wholesaling and retailing by TVA of electricity in the area served by the Alabama Power Company is not and will not be in aid of the regulation of navigation or national defense or other governmental function in so far as any plan, purpose or activity of the TVA or of the United States disclosed on this record would indicate."

Answering the Petitioners' Complaint, Alabama Company admitted "that the public statements of TVA indicated the program therein alleged; and the directors of respondent company considered that to vest such an agency as therein alleged with unlimited power and access to public funds, in a program of business competition and public ownership promotion in the area served by respondent company would in effect destroy this respondent's property; and such conclusion on its part was the

principal inducement for it to enter into the contracts of January 4 and August 9, 1934; and respondent company thereby was and will be enabled to salvage a larger amount of its property than it could have done by competition." Also, "that under the circumstances of threatened competition, directed or controlled by TVA as averred therein, this respondent agreed to the sale of certain of its transmission lines and property, and entered into the contract dated January 4, 1934. . . . Respondent company admits that at and before the execution of the contract, the threat was made to use federal funds to duplicate the facilities of respondent which would result in competition with rates not attainable by or permissible to this respondent, and such rates would be stipulated, controlled and regulated by TVA."

As matter of law the trial court found—

"The function intended by TVA under the evidence in relation to service, utility in type, in the area ceded by the contract of January 4, 1934, transcends the function of conservation or disposition of government property, involves continuing service and commercial functions by the government to fill contracts not governmental in origin or character."

"Performance of the contract of January 4th, 1934, would involve substantial loss and injury to the Alabama Power Company, including, inter alia, the loss or abandonment of franchises, licenses, going business and service area supporting its general system and power facilities and unless resisted would tend to invite a progressive encroachment on its service area by the Tennessee Valley Authority."

"Congress has no constitutional authority to authorize Tennessee Valley Authority or any other federal agency to undertake the operation, essentially permanent in character, of a utility system, for profit, involving the

generation, transmission and commercial distribution of electricity within State domain, having no reasonable relation to a lawful governmental use."

"The contract of January 4, 1934, expressly provided for the transfer of all or substantially all of the lines and properties of the Alabama Power Company for the service of the ceded area, included transmission lines, rural distribution systems and certain urban distribution systems, and contemplated the eventual transfer of fourteen urban distribution systems. This contract, expressly contemplating service of the ceded area by the Tennessee Valley Authority with electricity to be generated or purchased by the Tennessee Valley Authority for that purpose, was in furtherance of illegal proprietary operations by the Tennessee Valley Authority in violation of the Federal Constitution and void. The contract was accordingly ultra vires and void as to the Alabama Power Company."

Having made exhaustive findings of fact and law, the trial court entered a decree annulling the January 4th contract and enjoining the Alabama Power Company from performing it. The Circuit Court of Appeals reversed, upon the theory that the Authority was making proper arrangements for sale of surplus power from the Wilson dam. The injunction was continued.

I think the trial court reached the correct conclusion and that its decree should be approved. If under the thin mask of disposing of property the United States can enter the business of generating, transmitting and selling power as, when and wherever some board may specify, with the definite design to accomplish ends wholly beyond the sphere marked out for them by the Constitution, an easy way has been found for breaking down the limitations heretofore supposed to guarantee protection against aggression.