Jean LOPEZ, Arleen Deery, Alice Platt, Eleanor Kilbane, Agnes Waitonis, Ruth Lambert, Theresa Lopes, Jeannette Gallant, Jessie Skinner, Lucille Cecere, Lester Murray, Sal Terracciano, Harold Soderland, and Joe Zompa, Plaintiffs,

v.

BULOVA WATCH COMPANY, INC. d/b/a American Watch Case Co., a New York Corporation, Defendant.

Civ. A. No. 83–0585S.

United States District Court,
D. Rhode Island.

March 19, 1984.

Lovett, Morgera, Schefrin & Gallogly, Ltd., Marc B. Gursky, Aram R. Schefrin, Catherine A. Gibran, Providence, R.I., for plaintiffs.

Jackson, Lewis, Schnitzler & Krupman, Gregory I. Rasin, Diane K. Rembleske, New York City, Levy, Goodman, Semonoff & Gorin, Richard J. Israel, Barbara I. Cohen, Providence, R.I., for defendants.

Richard K. Willard, Asst. Atty. Gen., Carolyn Kuhl, Deputy Asst. Atty. Gen., Douglas Letter, Stephen Hart, Dept. of Justice, David L. Slate, Gen. Counsel, Philip B. Sklover, Assoc. Gen. Counsel, Vincent Blackwood, Asst. Gen. Counsel, Jeffrey C. Bannon, Staff Atty., E.E.O.C., Washington, D.C., Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for E.E.O.C. and U.S., amici curiae.

## OPINION AND ORDER

SELYA, District Judge.

### I. *The Battleground*

Advancing both federal and state grounds, the plaintiffs, former employees of the defendant Bulova Watch Company, Inc. (Bulova), have filed an action which challenges the termination of their employment status. Their complaint contains four statements of claim. The federal law count alleges a violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* (ADEA). The remainder, all brought as pendent state law claims, include a cause of action in fraud, one for breach of an express or implied employment agreement, and a third for breach of an implied covenant of good faith and fair dealing.[1] While the complaint is not a model of clarity, all of the plaintiffs' remonstrances apparently arise out of a now-defunct employment relationship between them and Bulova; and more specifically, out of Bulova's unilateral decision abruptly to sever that bond.

The litigation is presently before the court on Bulova's motion to dismiss.[2] The court has received both preliminary and post-argument briefs from the parties; and, having transmitted notice to the United States Attorney for this district of the defendant's challenge to an act of Congress, *see* Local Rule 27,[3] the court has had the benefit of a joint memorandum, focusing solely on the ADEA claim, filed by the Equal Employment Opportunity Commission (EEOC) and the United States as *amici curiae*.

---

1. Although the complaint, given the lead ADEA claim, is premised on federal question jurisdiction, 28 U.S.C. § 1331, counsel indicated at oral argument that there may be diversity jurisdiction, 28 U.S.C. § 1332, as well. The citizenship of the parties is, however, not distinctly alleged in the complaint. The parties have without exception briefed the state law questions in terms of Rhode Island law, so the court may accept the implicit premise that such law governs those claims. *In re Pioneer Ford Sales, Inc. (Ford Motor Company)*, 729 F.2d 27 at 31 (1st Cir. 1984).

2. Although the motion originally addressed both the liability claims asserted in plaintiffs' complaint and certain elements of the damages sought, the motion, as to the latter, was denied without prejudice at the time of oral argument. The court reserved Bulova's right to raise those challenges in a future motion, if necessary, after the air had been judicially cleared on the liability issues. Similarly, the court declined to pass on Bulova's attempt to declare the plaintiffs'

class action allegations, *see* Fed.R.Civ.P. 23, to be insufficient, leaving that question, too, to a later day.

3. Local Rule 27 provides in pertinent part as follows:

Notification of Claim of Unconstitutionality

Whenever the constitutionality of any Act of Congress affecting the public interest is or is intended to be drawn in question in any suit or proceeding to which the United States or any agency, officer, or employee thereof is not a party, the party raising or intending to raise such constitutional question shall immediately advise the court in writing of the existence of said question, .... The clerk shall notify in writing the United States Attorney of such challenge.

The nature and scope of the constitutional challenge which Bulova advances in the case at bar is fully explained *post*.

The gauntlet which Bulova throws down in response to the plaintiffs' age discrimination count proclaims, in essence, that this claim should be dismissed for want of subject matter jurisdiction because the plaintiffs failed to comply with certain statutory prerequisites prior to the commencement of suit. But, this distillation of Bulova's position belies its sophisticated logodaedalus. Some explication is required.

When enacted, the ADEA vested enforcement authority in the Secretary of Labor and provided, in relevant part, that

> [n]o civil action may be commenced by any individual under this section until the individual has given the Secretary not less than sixty days' notice of an intent to file such action. Such notice shall be filed ... within one hundred and eighty days after the alleged unlawful practice occurred....

Pub.L. No. 90–202, § 7(d), 81 Stat. 602, 605 (1967) (current version codified at 29 U.S.C. § 626(d)). In 1978, this section was amended to reflect, *inter alia*, the transfer of enforcement authority from the Secretary of Labor to the EEOC:

> No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Commission. Such a charge shall be filed ... within 180 days after the alleged unlawful practice occurred....

Pub.L. No. 95–256, § 4(b)(1), 92 Stat. 189, 190 (1978) (codified at 29 U.S.C. § 626(d)). The amended version was in force at all times relevant to the origin and assertion of the plaintiffs' discrimination charge against Bulova. And, there is no dispute but that the plaintiffs complied in a timely fashion with these amended filing requirements.

The sticking point, however, as Bulova views it, is that the transfer of authority from the Secretary of Labor to the EEOC was invalid. That transmogrification was effected by President Carter through Reorganization Plan No. 1 of 1978 (Plan), 43 Fed.Reg. 19807, 92 Stat. 3781, *reprinted in* 1978 U.S.Code Cong. & Ad.News 9799, as part of a full-court press to consolidate federal equal employment initiatives in a single agency. The Plan was promulgated pursuant to authority seemingly granted to the President by Congress in the Reorganization Act of 1977,[4] Pub.L. No. 95–17, 91 Stat. 29 (codified at 5 U.S.C. §§ 901 *et seq.*) (Reorganization Act). The Reorganization Act contains a "one-House legislative veto" provision, which allows any presidential reorganization plan to become effective within sixty days unless either the House or the Senate passes a resolution condemning it.[5] Because of this veto provision, Bulova argues, the Act is unconstitutional under the recent United States Supreme Court deci-

---

**4.** The presidential reorganization authority is not currently in effect. According to 5 U.S.C. § 905(b), "[a] provision contained in a reorganization plan may take effect only if the plan is transmitted to Congress within four years of the date of enactment of the Reorganization Act of 1977." That a president should be without authority to realign the executive branch is not a unique circumstance. Until the 1930s, restructuring was invariably accomplished through particularized legislation. Congress then began, however, to delegate much of its reorganization authority to the President. From that time hence, Congress has ridden a see-saw of sorts: it has periodically renewed the authority in fluctuating increments, more often than not gradually cutting back on the extent of the delegation. And, in 1973, with the winds of Watergate swirling through the legislative halls, Congress refused to leave President Nixon with any vestige of reorganization power. 123 Cong.Rec. 9344 (1977) (statement of Rep. Brooks, a sponsor of

H.R. 5045, a bill "to reestablish the period within which the President may transmit to the Congress plans for the reorganization of agencies of the executive branch of the Government, and for other purposes.") (S. 626 was passed in lieu of H.R. 5045). The Reorganization Act of 1977 was the first renaissance of that grant subsequent thereto.

**5.** Section 906(a) provides that,
> [e]xcept as otherwise provided under subsection (c) of this section, a reorganization plan is effective at the end of the first period of sixty calendar days of continuous session of Congress after the date on which the plan is transmitted to it unless, between the date of transmittal and the end of the sixty-day period, either House passes a resolution stating in substance that the House does not favor the reorganization plan.

sion in *Immigration and Naturalization Service v. Chadha*, — U.S. —, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); ergo, the supposed transfer of authority was invalid. Thus, according to the defendant's logic, the plaintiffs were required, as a prerequisite to suit, to file notice with the Secretary of Labor (as opposed to the EEOC). They did not do so. Consequently, Bulova concludes, the court lacks subject matter jurisdiction, and the plaintiffs' ADEA claim must be dismissed.

In contrast to the rococo structure of their ADEA thesis, Bulova's arguments in support of dismissal of the state claims are comparatively mundane. Bulova first avers that inasmuch as the federal claim must be dismissed, the court should cut loose the pendent state claims as well. It also contends that the plaintiffs have failed to plead fraud with the requisite specificity. Third, Bulova asserts that the state claims should be struck down in their entirety because, albeit stated as three separate causes of action, this trio of hortations represents, at bottom, a single effort to seek redress for the termination of an employment-at-will relationship, a cause of action which Rhode Island law has not recognized. And finally, Bulova maintains that the state claims should be dismissed for want of a fiduciary relationship between an employer and its employees.

## II. The ADEA Claim

While novel to this circuit, the precise issue raised by Bulova as to the plaintiffs' age discrimination claim has, in the roiling wake of *Chadha*, recently been addressed—with varying results—by district courts in other circuits. *See, e.g., EEOC v. Westinghouse Electric Corp.*, No. 83–1209, (W.D.Pa. Jan. 5, 1984) (order granting defendant's motion to dismiss); *EEOC v. City of Memphis*, 581 F.Supp. 179 (W.D.Tenn.1983) (order denying defendant's motion to dismiss); EEOC v. Jackson County, No. 83–1118 (W.D.Mo. Dec. 13, 1983) (order denying defendant's motion to dismiss); *Muller Optical Co. v. EEOC*, 574 F.Supp. 946 (W.D.Tenn.1983) (order denying plaintiffs' motion for preliminary injunction); *EEOC v. Allstate Insurance Co.*, 570 F.Supp. 1224 (S.D.Miss.1983) (defendant's motion for summary judgment granted). And, a solitary court of appeals has lately spoken to the subject. *See EEOC v. Hernando Bank*, 724 F.2d 1188 (5th Cir.1984) (summary judgment in favor of defendant vacated). One point of general agreement which emerges from the spate of neoteric caselaw and from the inevitable post-*Chadha* commentary [6] is that the Court has, at the very least, cast grave doubt over any and all legislation containing a one-House veto provision.[7] Indeed, though the sweep of *Chadha* may

---

**6.** *E.g., The Supreme Court, 1982 Term,* 97 Harv. L.Rev. 70, 191 (1983).

**7.** The one-House veto, that is, the ability to deflect action by means of a resolution passed by either House, is one of three types of congressional vetoes heretofore in vogue. The other two are the committee veto (action by one or more designated committees of Congress) and the concurrent veto (a resolution passed by both the House and the Senate). Abourezk, *The Congressional Veto: A Contemporary Response to Executive Encroachment on Legislative Prerogatives,* 52 Ind.L.J. 323, 324 (1977). Employed extensively in a wide variety of legislation since first conceived in 1932, "the use of the congressional veto in reorganization statutes has become an accepted practice by both Congress and the Executive." *Id.* at 339. Although the Supreme Court had never directly considered the legislative veto prior to *Chadha*, congress-

men and scholars alike, in addition to attorneys general of the United States, have openly questioned the constitutionality of the device for nearly half a century. The legislative history of the Reorganization Act is replete with evidence of widespread skepticism concerning the legality of the veto. *See, e.g., Providing Reorganization Authority to the President: Hearings on H.R. 3131, H.R. 3407, and H.R. 3442 Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations,* 95th Cong., 1st Sess. (1977) (statement and discussion of Hon. Antonin Scalia at 56–75; of Prof. Laurence H. Tribe at 76–91; of Prof. Philip B. Kurland at 134–44; supplementary materials at 202–49; 123 Cong. Rec. 9344 (1977) (remarks of Rep. Brooks); *id.* at 9350–51, 9356 (remarks of Rep. Walker); *id.* at 9351–52 (remarks of Rep. Drinan); *id.* at 9361 (remarks of Rep. Steiger).

be narrowed in the future, its apparent scope is extremely broad.[8]

The underlying litigation in *Chadha* involved a challenge to the one-House veto provision of the Immigration and Nationality Act (INA).[9] Acting under that section, the House of Representatives had vetoed an executive branch decision to suspend deportation hearings against Jagdish Rai Chadha, an alien whose visa had expired.[10] Before reaching the constitutionality of the veto provision, the Court determined that the provision was susceptible to amputation from the remainder of the INA; and therefore, that only the disputed section would be impacted by a ruling of unconstitutionality. The Court explained that "the invalid portions of a statute are to be severed ' "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." ' " *Chadha*, 103 S.Ct. at 2774, quoting *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976), quoting *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932). The presence of a sever-

ability clause in the INA raised the presumption that Congress did not intend the act as a whole to fall in the event that any part was held invalid. *Chadha*, 103 S.Ct. at 2774. The veto provision was further presumed severable because the INA, in the absence of the offending section, was " 'fully operative as a law.' " *Id.* at 2775, quoting *Champlin Refining*, 286 U.S. at 234, 52 S.Ct. at 564. The Court determined that, insofar as the legislative history of the INA seemed to conduce to a contrary result, it was insufficient to rebut the presumption of severability.

Using fairly expansive language, the Court went on to hold that the one-House veto was unconstitutional under the bicameralism clauses, U.S. Const., art. I, § 1, and § 7, cl. 2, and under the presentment clauses, *id.* at § 7, cls. 2, 3. The Court characterized these clauses as "integral parts of the constitutional design for the separation of powers." *Chadha*, 103 S.Ct. at 2781. Emphasizing the tenets underlying the incorporation of these principles, the Court described the Framers' intent as being that "legislation should not be enacted unless it has been carefully and fully considered by

---

**8.** Justice Powell, concurring in the judgment, stated that the majority decision, "based on the Presentment Clauses, Art. I, § 7 cls. 2 and 3, apparently will invalidate every use of the legislative veto." *Chadha*, 103 S.Ct. at 2788 (Powell, J., concurring). He went on to qualify his observation, however: "Whether the veto complies with the Presentment Clauses may well turn on the particular context in which it is exercised, and I would be hesitant to conclude that every veto is unconstitutional on the basis of the unusual example presented by this litigation." *Id.* at 2788 n. 1. And Justice White, in dissent, wrote: "Today the Court not only invalidates § 244(c)(2) of the Immigration and Nationality Act, but also sounds the death knell for nearly 200 other statutory provisions in which Congress has reserved a 'legislative veto.' " *Id.* at 2792 (White, J., dissenting).

This court acknowledges that a powerful argument can be made to distinguish the *exercise* of a one-House legislative veto (such as was before the *Chadha* Court) from the mere presence of the *unused* legislative veto provision in the Reorganization Act. In the latter instance (unlike the former), there was no avulsion by the Congress of previously-delegated authority, nor any meddling with an act of the executive branch. But, given the circumstances of this

case, *see* text *post*, resolution of such fine distinctions can safely await the dawning of a new day.

**9.** Section 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2), provides:

In the case of an alien specified in paragraph (1) of subsection (a) of this section—if during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, either the Senate or the House of Representatives passes a resolution stating in substance that it does not favor the suspension of such deportation, the Attorney General shall thereupon deport such alien or authorize the alien's voluntary departure at his own expense under the order of deportation in the manner provided by law. If, within the time above specified, neither the Senate nor the House of Representatives shall pass such a resolution, the Attorney General shall cancel deportation proceedings.

**10.** Section 244(c)(1) of the INA, 8 U.S.C. § 1254(c)(1), allows the Attorney General of the United States, in his discretion, to halt deportation of any alien who applies for suspension and who meets certain other statutory criteria.

the Nation's elected officials," *id.* at 2783, and that "the legislative power of the Federal government be exercised in accord with a single, finely wrought and exhaustively considered, procedure." *Id.* at 2784.

*Chadha* was a decision of landmark proportions, and its vibrations swiftly emanated throughout the federal judicial system. Addressing the impact of *Chadha* on the transfer of Equal Pay Act enforcement authority, a circumstance perfectly analogous to the ADEA issue *sub judice*,[11] the first court to confront the issue found the veto provision of the Reorganization Act unconstitutional and inseparable. *EEOC v. Allstate Insurance Co., supra.* That court held the transfer invalid, and adjudged the EEOC to be bereft of authority to bring Equal Pay Act suits. *Id.* at 1234. Perhaps of even greater potential consequence, *Allstate Insurance* determined that this holding warranted retroactive application. *Id.* at 1232–33.

The next battle was waged soon after in *Muller Optical v. EEOC, supra,* which arose from an age discrimination investigation. The court in *Muller Optical* abjured the reasoning of the *Allstate Insurance* court and held the veto provision of the Reorganization Act unconstitutional but severable. *Muller Optical,* 574 F.Supp. at 953. It therefore upheld the validity of the transfer of enforcement and investigative authority over age discrimination claims to the EEOC. As alternative support for the validity of the transfer, and in direct contradiction to *Allstate Insurance,* 570 F.Supp. at 1233–34, *Muller Optical* found that Congress had ratified the Plan insofar as the shift of these functions was concerned.[12] *Muller Optical,* 574 F.Supp. at 953–54.

Most recently, after oral arguments had been heard in this matter, a panel of the Fifth Circuit vacated a grant of summary judgment which had been bestowed upon an employer in an Equal Pay Act case. *EEOC v. Hernando Bank, supra.* The district court had allowed *brevis* disposition in favor of the defendant, but without adopting the bank's contention that *Chadha* invalidated the Reorganization Act (and, by extension, nullified the Plan). The agency appealed, and the defendant cross-appealed. Judge Politz, writing for a unanimous panel, found that the interdicted veto clause did not pass constitutional muster. The court then traced the legislative history of the Reorganization Act and concluded that:

> [T]he unconstitutional legislative veto provision is severable even though the Reorganization Act of 1977 contains no severability clause, because neither the express language of the statute nor the Act's legislative history makes it "evident that the legislature would not have enacted" the remainder of the Act in the absence of the legislative veto provision. *See Buckley v. Valeo,* 424 U.S. 1, 109, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976). Mere uncertainty about the legislature's intent is insufficient to satisfy the test announced in *Buckley v. Valeo.* We therefore hold that the remainder of the Act "is fully operative as a law." *Id.*

We further find and hold that the Reorganization Act validly delegated to the President the legislative authority to promulgate executive branch reorganization plans. Because President Carter's Reorganization Plan No. 1 of 1978 conformed to the substantive provision of the Act and did not transgress any of the limitations imposed by 5 U.S.C. § 905, the plan is enforceable as law. The plan thus effected a valid transfer of governmental authority to enforce the Equal

---

**11.** Reorganization Plan No. 1 of 1978 (upon which Bulova's guns are trained here) also transferred enforcement authority for the Equal Pay Act from the Secretary of Labor to the EEOC. Both transfers, of course, were implemented under the Reorganization Act. And, unlike the INA, the Reorganization Act contains no severability clause.

**12.** An even more current decision from the District Court for the Western District of Tennessee mirrors the reasoning of *Muller Optical. EEOC v. City of Memphis, supra; accord EEOC v. Jackson County, supra.* But see *EEOC v. Westinghouse Electric Corp., supra.*

Pay. Act from the Secretary of Labor to the EEOC.

724 F.2d at 1192.

Before plunging into this raging maelstrom of conflicting judicial opinions, however, a moment of quiet reflection is helpful. When one analyzes the nature and essence of the proceedings underlying the decisions cited *ante*, it is readily apparent that the instant litigation differs in one very significant respect: the EEOC is not a party to this action. Thus, unlike the employers in the previous cases, Bulova is not directly contesting the transferee agency's authority to sue or to investigate. Rather, this defendant is assailing the effectiveness of the attempted compliance by these plaintiffs (private litigants all) with the statutory prerequisites to suit. The plaintiffs' compliance can only be held defective if this court holds both that the transfer of authority to the EEOC was invalid for the reasons advanced and that the plaintiffs failed to fulfil the statutory requirements. In sum, while the previously adjudicated challenges to the Plan were so framed that the forum courts had no choice but to reach the merits of the constitutional claim, this court is presented with the issue in a materially altered posture. And, the circumstances in which Bulova promotes the constitutional issue commend a variant approach.

■ It is a well-settled canon of federal jurisprudence that courts should avoid the needless resolution of constitutional questions. There is scant warrant gratuitously to hold a farthing candle to the sun when necessity does not plainly demand such heroics. If a case can be disposed of on a less far-reaching ground, the constitutional issue should not be addressed. Most conspicuously articulated by Justice Brandeis in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 346–48, 56 S.Ct. 466, 480, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), this prudential rule persists as a vigorous and self-imposed circumscription on the awesome power of the federal judiciary. *See, e.g., Mills v. Rogers*, 457 U.S. 291, 305, 102 S.Ct. 2442, 2451,

73 L.Ed.2d 16 (1982); *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 2199, 68 L.Ed.2d 693 (1981); *Hagans v. Lavine*, 415 U.S. 528, 546–47, 94 S.Ct. 1372, 1383–84, 39 L.Ed.2d 577 (1974); *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 568–73, 67 S.Ct. 1409, 1419–22, 91 L.Ed. 1666 (1947); *In re Justices of the Supreme Court of Puerto Rico*, 695 F.2d 17, 22 (1st Cir.1982); *Belcher v. Mansi*, 569 F.Supp. 379, 382 (D.R.I.1983). Thus, even if Bulova's constitutional challenge is creditable—and this court intimates neither that it is or is not—it would be an exercise of unbridled judicial overreaching for this court to grapple with it, inasmuch as the plaintiffs here, irrespective of the impuissance of the Reorganization Act, complied with the ADEA filing requirement to a sufficient extent that the motion to dismiss should be denied.

In confronting the question whether, under the facts and circumstances at bar, the seasonable filing of a charge with the EEOC constitutes compliance by a private suitor with the requirements of the ADEA, the court necessarily assumes, *arguendo*, that the movant's contentions are correct and that the transfer of authority from the Secretary of Labor was not licitly accomplished. Anticipating the possibility that its motion might, despite its imprecations to the contrary, be decided short of the constitutional threshhold, Bulova has argued that the charge filing requisite is jurisdictional. If this is so, its reasoning runs, the court would lack subject matter jurisdiction because the filing was itself nugatory. But, while this contention, taken in the abstract, has a plausible ring, it shrivels in the bright sunshine of an exegetic overview of the situation at hand.

■ In both its present and former incarnations, § 626(d) of the ADEA limns two time periods: a sixty day moratorium subsequent to filing (conciliation period) during which no civil action may be commenced, and a one hundred eighty day interval following the occurrence of the alleged unlawful practice (limitations period), within which the plaintiff must file.

Courts of appeals which have considered the character of the limitations period have consentiently held that failing to file within that time span will not perforce bar a plaintiff from the courts because the condition, more like a statute of limitations than a jurisdictional prerequisite, is subject to equitable modification. *E.g., Lawson v. Burlington Industries,* 683 F.2d 862 (4th Cir.), *cert. denied,* 459 U.S. 944, 103 S.Ct. 257, 74 L.Ed.2d 201 (1982); *Wright v. Tennessee,* 628 F.2d 949 (6th Cir.1980) (en banc); *Coke v. General Adjustment Bureau, Inc.,* 616 F.2d 785 (5th Cir.1980); *Nielsen v. Western Electric Co.,* 603 F.2d 741 (8th Cir.1979); *Kephart v. Institute of Gas Technology,* 581 F.2d 1287 (7th Cir.1978), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Bonham v. Dresser Industries,* 569 F.2d 187 (3d Cir.1977), *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); *Dartt v. Shell Oil Co.,* 539 F.2d 1256 (10th Cir.1976), *aff'd by an equally divided Court,* 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977). The power equitably to extend the limitations peri-

od, sparingly used, "honor[s] the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Zipes v. Trans World Airlines,* 455 U.S. 385, 398, 102 S.Ct. 1127, 1135, 71 L.Ed.2d 234 (1982) (holding that filing a timely charge with the EEOC is not a jurisdictional prerequisite to bringing a Title VII suit but, rather, a requirement subject to waiver as well as to tolling when fundamental fairness so requires).[13] And, the legislative history of the 1978 amendments comports with this result.[14] Although the court of appeals for this circuit has not yet decided the question, it seems unlikely that the First Circuit would hesitate to adopt the well-reasoned approach heretofore chosen by several of its sister circuits.[15] That outcome would be particularly appropriate in a case such as this, where there is no suggestion that the claims are stale. After all, such petrification is the precise evil against which the limitations period embedded in § 626(d)

---

**13.** Because Title VII is the "closest legislative parallel" of the ADEA, *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 700 (1st Cir.1983), and because they share a common purpose, *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979), caselaw construing Title VII is persuasive on ADEA questions. *Cf. Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Earnhardt v. Puerto Rico,* 691 F.2d 69, 72 (1st Cir.1982).

**14.** The Joint Explanatory Statement of the Committee of Conference, H.R.Conf.Rep. No. 95–950, 95th Cong., 2d Sess. 7, 12, *reprinted in* 1978 U.S.Code Cong. & Ad.News 504, 528, 534, contains the conference agreement relative to retaining the limitations period but changing the prelitigation directive anent the conciliation period from "until the individual has given the Secretary not less than sixty days' notice of an intent to file such action" to "until 60 days after a charge alleging unlawful discrimination has been filed with the Commission":

> This change in language is not intended to alter the basic purpose of the notice requirement, which is to provide the Department with sufficient information so that it may notify prospective defendants and to provide the Secretary with an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation. Therefore,

the conferees intend that the "charge" requirement will be satisfied by the filing of a written statement which identifies the potential defendant and generally describes the action believed to be discriminatory.

> The conferees agree that the "charge" requirement is not a jurisdicitonal prerequisite to maintaining an action under the ADEA and that therefore equitable modification for failing to file within the time period will be available to plaintiffs under this Act. See, *e.g., Dartt v. Shell Oil Co.,* 539 F.2d 1256 (10th Cir.1976), affirmed by an evenly divided court, 434 U.S. 99, 98 S.Ct. 600, 54 L.Ed.2d 270 (1977); *Bonham v. Dresser Industries, Inc.,* 16 FEP Cases 510 (3d Cir.1977); *Charlier v. S.C. Johnson & Son, Inc.,* 556 F.2d 761 (5th Cir.1977).

(Footnote omitted).

**15.** The First Circuit has specifically declined to decide whether the limitations period may be equitably tolled. *E.g., Ciccone v. Textron, Inc.,* 616 F.2d 1216, 1218 n. 3, 1220 n. 7 (1st Cir.), *vacated on other grounds,* 449 U.S. 914, 101 S.Ct. 311, 66 L.Ed.2d 143 (1980); *cf. Earnhardt v. Puerto Rico, supra* (Title VII). In *Earnhardt,* the First Circuit cited—and not disapprovingly—*Skoglund v. Singer Co.,* 403 F.Supp. 797 (D.N.H.1975), a decision by Judge Bownes (then a district judge) which held that the § 626(d) one hundred eighty day time limit is subject to equitable tolling. *Earnhardt,* 691 F.2d at 73.

protects. *Oscar Mayer & Co.*, 441 U.S. at 762–63, 99 S.Ct. at 2074–75.

■ Although the spirit of the equitable modification cases is of undeniable relevance, the cases themselves are factually distinguishable from the instant matter. These plaintiffs did not file late: even on the defendant's hypothesis they merely filed with the "wrong" agency. Equity has intervened to forestall terminal consequences in "wrong agency" filings in other contexts, when the setting has so warranted. *E.g., Morgan v. Washington Manufacturing Co.*, 660 F.2d 710, 712 (6th Cir. 1981); *Egelston v. State University College at Genesco*, 535 F.2d 752, 755 n. 4 (2d Cir.1976). And, even in this novel ADEA configuration, the plaintiffs' position is at first blush more akin to that of claimants who brought suit within sixty days after notifying the proper agency or without any notification at all.

This court acknowledges the important role that the sixty day constraint plays in the federal scheme, evidenced in the final sentence of 29 U.S.C. § 626(d):

> Upon receiving such a charge, the Commission shall promptly notify all persons named in such charge as prospective defendants in the action and shall promptly seek to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion.

The legislative history of the ADEA expands upon the preeminence of this mandate, emphasizing that pacificatory efforts prior to suit are strictly required, not merely encouraged. H.R.Rep. No. 805, 90th Cong., 1st Sess. 5, 9, *reprinted in* 1967 U.S.Code Cong. & Ad.News 2213, 2218, 2223. The legislative history of the liberalizing amendments to § 626(d), enacted in 1978, reiterated that "the basic purpose of the notice requirement" remained unchanged. *See* note 14 *ante.*

A number of courts of appeals have determined that the sixty day period of § 626(d) is a jurisdictional prerequisite to suit. *See, e.g., Vance v. Whirlpool Corp.*, 707 F.2d 483, 489 (4th Cir.), *aff'd*, 716 F.2d 1010 (4th Cir.1983); *Wright v. Tennessee*,

628 F.2d at 953 (6th Cir.); *Newcomer v. International Business Machines Corp.*, 598 F.2d 968, 969 (5th Cir.), *cert. denied*, 444 U.S. 984, 100 S.Ct. 491, 62 L.Ed.2d 413 (1979); *Reich v. Dow Badische Co.*, 575 F.2d 363, 367–68 (2d Cir.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Cannon v. University of Chicago*, 559 F.2d 1063, 1076–77 (7th Cir.1976), *rev'd in part and remanded on other grounds*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Yet, if the case had been filed prematurely vis-a-vis the sixty day notice (whether by reason of jumping the temporal gun or by reason of failing to notify the agency at all), the equitable modification doctrine would, if the interests of justice so required, plainly allow the action to be salvaged, for the court would have the power to permit the plaintiffs to "refile" their complaints with the Secretary of Labor and to recommence court proceedings sixty days following. But, as pertains to the case at bar, nothing has come to the court's attention to indicate that filing with the Secretary of Labor now would be anything but a fruitless exercise; since the shift of ADEA appropriations and personnel from the Secretary to the EEOC, any such filing would in all probability be greeted with the blankest of stares. For this reason, as the Supreme Court fittingly stated in a similar context, refiling "would serve no purpose other than the creation of an additional procedural technicality. Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Love v. Pullman Co.*, 404 U.S. 522, 526–27, 92 S.Ct. 616, 618–19, 30 L.Ed.2d 679 (1972) (footnote omitted). *See also Oscar Mayer & Co.*, 441 U.S. at 761, 99 S.Ct. at 2074. There is no rhyme or reason in requiring a party to dance a ritualistic jig purely for its own sake.

And, to allow Bulova to prevail on its motion because the plaintiffs filed with the EEOC rather than the Secretary, and therefore failed to lodge "proper" notice sixty days before commencing suit, would, under the facts of this case, constitute

more than paying empty homage to a mere additional technicality; it would work the ultimate absurd elevation of form over substance. Such fastidiousness is precisely the sort of overnice hairsplitting, analogous perhaps to the circumcision of fleas, which has given courts and lawyers a bad name. When all is said and done:

> The Age Discrimination Act is remedial and humanitarian legislation. It is to be construed liberally to achieve its purpose of protecting older employees from discrimination. A procedural requirement of the Act, of doubtful meaning in a given case, should not be interpreted to deny an employee a claim for relief unless to do so would clearly further some substantial goal of the Act.

*Moses v. Falstaff Brewing Corp.*, 525 F.2d 92, 93–94 (8th Cir.1975) (citations omitted).

Moreover, the cases which have held that the sixty day requirement of § 626(d) is jurisdictional pivot in large part on the primacy of the conciliation endeavor and the salience of the opportunity to attempt to resolve the dispute informally before resorting to the courts. *E.g., Vance*, 707 F.2d at 489; *Reich*, 575 F.2d at 368. But, the instant case is extraordinary. These claimants followed exactly the letter of an act of Congress, read in the emergent light of an apparently impeccable Plan, promulgated under the authority of the President. They, certainly, were neither blameworthy nor negligent. Other courts have held that government error, not fairly attributable to a putative victim of employment discrimination, should not preclude the employee's prosecution of the charge where equity militates to the contrary. *Waiters v. Robert Bosch Corp.*, 683 F.2d 89, 92 (4th Cir.1982) (Title VII); *Gates v. Georgia-Pacific Corp.*, 492 F.2d 292, 295 (9th Cir.1974) (Title VII); *cf. DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, *modified on reh'g*, 520 F.2d 409, 410–11 (2d Cir.1975). Despite the fact that these cases arise in a somewhat dissimilar framework, logic suggests no reason for the courts to apply such a salu-

tary principle to protect legitimate rights against agency miscues in the limitations period context, and yet to look the other way when law-makers sow "the seed of Chaos, and of Night," [16] as in the present gestalt. Given the presumption of regularity which attaches in such circumstances, it would be manifestly unjust to expect the plaintiffs to bear the crushing burden of congressional folly which Bulova seeks, by its motion, to inflict upon them.

The complaint reveals that the plaintiffs filed charges with the EEOC more than sixty days prior to commencing suit. They likewise cited the defendant to the state Human Rights Commission in a timely fashion. Indeed, the plaintiffs have in good faith complied with all of the prelitigation ADEA procedural requirements codified in the current United States Code, and they would be seriously harmed if their action is dismissed. Bulova has not argued that the EEOC was, during the relevant time frame, either unable or unwilling to try to adjust the claims through informal methods. Neither has Bulova disputed that it was formally notified, in a quintessentially timely fashion, of the potential for litigation. Bulova was in no way prejudiced because the plaintiffs filed with the EEOC rather than the Secretary; nor were the dimensions of the window of conciliation altered. The purposes of § 626(d) have unquestionably been fulfilled.

To grant the defendant's motion to dismiss would be mindlessly to frustrate the liberal equitable and remedial goals of the ADEA. Bulova's thrust, at its core, seizes upon a shield erected by the law to protect employers from timeworn claims and seeks to wield it as a sword to cleave employee rights which have seasonably been asserted. "(A)lthough the law is a highly learned profession, we are well aware that it is an intensely practical one." [17] And, as a matter not only of practicality but of rudimentary fairness, this court will not allow such a perversion of the statutory purpose to

---

16. A. Pope, *The Dunciad*, Book IV, line 13 (1743).

17. *Sweatt v. Painter*, 339 U.S. 629, 634, 70 S.Ct. 848, 850, 94 L.Ed. 1114 (1950) (Vinson, C.J.).

occur. The court holds that the plaintiffs have adequately complied with the sixty day notice requirement. Accordingly, the motion to dismiss must be denied as it relates to the plaintiffs' age discrimination claim.[18]

### III. *The State Law Claims*

#### A. *Pendent Jurisdiction*

■ The movant correctly asserts that federal courts should not exert pendent jurisdiction over state law claims if the federal claims are dismissed prior to trial. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Rice v. President and Fellows of Harvard College,* 663 F.2d 336, 339 (1st Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982). This truism is, however, of purely academic interest in view of the court's denial of the defendant's motion to dismiss the ADEA claim. Since the federal and state claims arise out of a common nucleus of fact, pendent jurisdiction over the latter will be retained. *United Mine Workers v. Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138; *Durso v. Rowe,* 579 F.2d 1365, 1372 (7th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979).

#### B. *Rule 9(b)*

■ Bulova asseverates that the second statement of claim—for fraud—is too general to stand. Rule 9(b) of the Federal Rules of Civil Procedure mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The First Circuit has interpreted Rule 9(b) to require "specification of the time, place, and content of an alleged false representation." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226, 228 (1st Cir.1980). As

this court has recently had occasion to observe:

Fraud is different than ordinary notice pleading. In run-of-the-mill cases, the rules of pleading allow a party to discover a claim after filing. The very purpose of Rule 9(b), however, runs to the contrary. In cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action. The mandate for specificity is a product of "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing . . . ." *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972).

*Deyhle v. Barclay Investments, Inc.,* No. 82–0662, slip op. at 4 (D.R.I. Oct. 13, 1983) (order dismissing plaintiffs' fraud count, without prejudice, and denying defendant Everett's motion to dismiss or for summary judgment).

While the court is mindful of the need to harmonize Rule 9(b) with the imperatives of Fed.R.Civ.P. 8, *see, e.g., McGinty,* 633 F.2d at 228–29; *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), "the reconciliation of the two rules does not afford a suitor carte blanche to pursue a defendant in an action based on fraud with buckshot." *Deyhle,* slip op. at 5. Here, the fraud count is almost wholly conclusory, and is sorely lacking in specifics. It is too vague to meet the Rule 9(b) benchmark.

#### C. *Rule 12(b)(6)*

■ As noted at the outset, Bulova also asseverates that each and all of the state law counts should be dismissed for failure to state a claim upon which relief can be

---

**18.** The court is of the opinion that this ruling involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the court's order in this respect may materially advance the ultimate termination of the litigation. Should Bulova wish, therefore, to essay at this time an interlocutory appeal in pursuance

of 28 U.S.C. § 1292(b), the court will, upon presentment by the defendant of a supplementary order within twenty days from the date hereof, issue the requisite certificate and will stay further proceedings in this case while the application for leave to appeal is pending (and thereafter, for the duration of appellate proceedings, should the application be granted).

granted. This argument prescinds from the defendant's view that the claims are merely three variations on a single discordant theme; and that the causes of action putatively asserted do not harmonize with Rhode Island law as it applies to at-will employment. When considering a motion brought pursuant to Fed.R.Civ.P. 12(b)(6), the court must view all facts and inferences in the light most favorable to the nonmoving party. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir.1976); *Seveney v. United States Government, Department of the Navy*, 550 F.Supp. 653, 655 (D.R.I.1982). Only if it appears beyond doubt from the pleadings that the party opposing the motion can prove no set of facts which would support the claim for relief may the court grant the motion to dismiss. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Melo-Tone Vending v. United States*, 666 F.2d 687, 688 (1st Cir. 1981); *Ballou v. General Electric Co.*, 393 F.2d 398, 399 (1st Cir.1968); *Newport National Bank v. United States*, 556 F.Supp. 94, 95 (D.R.I.1983).

■ Count II of the complaint sounds in fraud; it has been treated with, *see* Part III (B) *ante,* and no useful purpose would be served by discussing it under this rubric as well. The remaining two state law counts, while not subject to the strictures of Rule 9(b), are similarly flawed. As heretofore indicated, *see* text *ante,* the third statement of claim is for breach of contract. Paragraph 50 of the complaint avers that the agreement in question was "express or implied." No allegation is made as to the duration of the supposed contract. The fourth statement of claim—which posits a putative breach of an implied covenant of good faith and fair dealing—inherits this defect, inasmuch as that count incorporates paragraph 50 and adopts it by reference. Complaint at ¶ 54. If, as these counts hint, an express contract existed, an explication of the terms thereof (especially as to duration and termination) would be essential to a reasoned consideration of *brevis* disposition. On the other hand, if (as the briefs suggest) the backdrop of this litigation is nothing more than parol hiring and employment at will, dismissal might well be appropriate under Rhode Island law.[19]

Moreover, while the complaint is rife with allegations anent both a so-called "departmental seniority system," *e.g.,* complaint at ¶ 26, and a so-called "job seniority system," *e.g., id.* at ¶ 28, it is silent as the tomb concerning whether or not a collective bargaining agreement was in force and-or whether or not a grievance/arbitration or similar procedure was extant. Such considerations may well be relevant—indeed dispositive—in certain eventualities. *See, e.g., Bertrand v. Quincy Market Cold Storage & Warehouse Co.*, 728 F.2d 568 at 570–571, slip op. at 4–5 (1st Cir.1984).

There is no need for the court to play hide-and-seek: if the plaintiffs have one or more causes of action in contract, they should have an opportunity—and a corollary obligation—properly to plead the same. And, as previously remarked, Count II of the complaint must in any event be restated if it is to fly.

The failure of the plaintiffs to demonstrate the legal sufficiency of their state law claims is not fatal, however, so long as the court is persuaded that a state of facts may well be lurking in the background which, if properly pleaded, would withstand dismissal. *Scheuer v. Rhodes*, 416 U.S. at

**19.** This issue was recently addressed in *Brainard v. Imperial Manufacturing Co.*, 571 F.Supp. 37, an opinion authored by Senior Judge Pettine. *Brainard* postulated that "it is well settled Rhode Island law that an employment contract for an indefinite period is terminable by either party at will. *Rotondo v. Seaboard Foundry, Inc.*, 440 A.2d 751, 752 (R.I.S.Ct.1981); *Oken v. National Chain Co.*, 424 A.2d 234, 237 (R.I.S.Ct. 1981); *School Committee of Providence v. Board of Regents for Education* [112 R.I. 288], 308 A.2d 788, 790 (R.I.S.Ct.1973)." Id. at 39. In such a situation, *Brainard* rejects the notion that at-will employment, without more, embraces an implied covenant of good faith or fair dealing under Rhode Island law. *Id.* at 40. *Brainard* is the best available statement of law on the subject; and this court discerns no reason why, if the material facts are not distinguishable, *Brainard* should not be controlling here.

236, 94 S.Ct. at 1686; *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 101–02; *Melo-Tone Vending,* 666 F.2d at 688; *Ballou,* 393 F.2d at 399. Given the liberal perspective of the Federal Rules in this regard, *e.g.,* Fed.R.Civ.P. 15(a), dismissal without leave to renew is not presently indicated on the pendent claims.

### IV. *Conclusion*

To recapitulate: Bulova's motion to dismiss the ADEA claim is denied; subject, however, to Bulova's right to apply for immediate review of this ruling under 28 U.S.C. § 1292(b) (*see* note 18, *ante*); and Bulova's motion to dismiss each and all of the state law counts is granted. But, because the plaintiffs are entitled to an opportunity to amend their deficient pleadings, the court dismisses those claims without prejudice and with leave to file a conformed and amended complaint. *Ballou,* 393 F.2d at 399–400; *cf. Czosek v. O'Mara,* 397 U.S. 25, 27, 90 S.Ct. 770, 772, 25 L.Ed.2d 21 (1970). The plaintiffs shall have twenty days from the date hereof within which to file a conformed and amended complaint, reiterating their federal claim and more particularly stating (consonant with the teachings hereof) any pendent claims which they wish to pursue.[20] The defendant shall have twenty days thereafter within which to answer or otherwise respond to all facets of the conformed and amended complaint. In light of the foregoing, Bulova's contention that the state law claims are vulnerable for want of a fiduciary duty between the employer and its employees is supererogatory, and need not be addressed.

*It is so ordered.*

---

**20.** In so doing, the citizenship of the parties for diversity purposes should be clarified as well.

*See* note 1, *ante.*